# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Metro Sales, Inc.,                                    Civil No. 15-3233 (DWF/SER)

        Plaintiff,

v.                                                    **MEMORANDUM**
                                                      **OPINION AND ORDER**

Core Consulting Group, LLC and
Rodger Mohagen,

        Defendants.

and

Core Consulting Group, LLC,

        Counter-Claimant,

v.

Metro Sales, Inc.,

        Counter-Defendant.

_____

Gretchen L. Gurstelle, Esq., Karla M. Vehrs, Esq., and Sarah Pruett, Esq., Lindquist &
Vennum LLP, counsel for Plaintiff.

Kasey D. McNary, Esq., and Ronald H. McLean, Esq., Serkland Law Firm, counsel for
Defendants.
_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Plaintiff Metro Sales, Inc. ("MSI"). (Doc. No. 59.) Also before the Court is MSI's Motion to Exclude Expert Testimony. (Doc. No. 62.) Defendants Core Consulting Group, LLC ("Core") and Rodger Mohagen ("Mohagen") (collectively, "Defendants"), oppose the motions. (Doc. Nos. 72, 73.) For the reasons set forth below, the Court grants the motions, in part, consistent with this opinion. As outlined below, the following claims will proceed to trial: (1) Plaintiff's breach-of-fiduciary-duty and declaratory judgment claims; and (2) Core's breach-of-contract and deceit counterclaims.

## BACKGROUND

Jerry Mathwig ("Mathwig") is the founder and president of Metro Sales, Inc., a Minnesota corporation that provides and services office equipment. (Doc. No. 75 ("McNary Decl.") ¶ 3.bb, Ex. 28 ("Mathwig Dep.") at 21:20-22, 23:16-18, 28:15-23, 35:14-19.) This case relates to MSI's efforts to pursue an employee stock ownership plan ("ESOP")[1] for the company in late 2014 through the spring of 2015 in consultation with Core Consulting Group, LLC.

---

[1]    "[A]n 'employee stock ownership plan' (ESOP) [is] a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014). Through various statutory provisions, Congress has encouraged companies to pursue ESOPs. *See id.* at 2465-66 ("The Congress, in a series of laws [including ERISA] has made clear its interest in encouraging [ESOPs] as a bold and innovative method of strengthening the free private enterprise system." (quoting Tax Reform Act of 1976, § 803(h), 90 Stat. 1590)).

# I.    The First Consulting Agreement

In an October 2, 2014 e-mail, Mathwig reached out to Core, a North Dakota company that provides professional ESOP services.  (McNary Decl. ¶ 3.c, Ex. 3.) Mathwig sent the e-mail to Core's president, Rodger Mohagen, asking if he and his company would be interested in discussing a possible ESOP for a Minneapolis company. (*Id.*)  Mohagen's response was positive, and the parties signed an initial Consulting Agreement (the "First Consulting Agreement") effective October 30, 2014 for Core to provide MSI with an ESOP "feasibility analysis."  (*Id.*; Doc. No. 67 ("Vehrs Decl.") ¶ 2, Ex. 3 ("1st CA").)  The First Consulting Agreement had the following purposes:

> [T]o gather information related to the governance and operations of [MSI] necessary to allow [Core] to determine primary issues to be addressed in [MSI's] formation and ongoing sponsorship of an [ESOP] . . . and to present these issues to [MSI] in a form . . . which enables [MSI] to make informed decisions in forming and addressing ongoing administration of a[n] . . . ESOP.

(*Id.*, Ex. 1.)  In performing the feasibility analysis, Core anticipated that it would "[r]equest and review . . . [MSI] documents," and "review and comment on" implementing the ESOP as well as pre- and post-ESOP-formation transaction issues. (*Id.*)  These services were to run from October 30, 2014 through January 15, 2015.  (*Id.*) The First Consulting Agreement had "a fixed fee of . . . $35,000."  (*Id.* ¶ 2.)

# II.    The Second Consulting Agreement

MSI and Core entered into another Consulting Agreement (the "Second Consulting Agreement") effective December 16, 2014 with a fixed fee of $25,000.  (Doc. No. 1 ("Compl.") ¶ 9, Ex. B ("2nd CA").)  The Second Consulting Agreement contained

the same provisions as the first, but provided for additional services to run from December 8, 2014 through January 30, 2015. (*Id.*; *see also* 1st CA.) The services in the Second Consulting Agreement focused on designing and drafting documents for the ESOP, such as an ESOP plan document, minutes, and other corporate documents. (2nd CA, Ex. 1.) Core also agreed to counsel MSI on several issues, including the timing of employee notices, provisions to include in the ESOP Document, the accrual and payment of ESOP contributions, and "anticipated income tax benefits." (*Id.*)

Communication and work on services contained in each of the two signed Consulting Agreements continued after the terms of the contracts ended. The feasibility analysis continued into February 2015, when Mohagen e-mailed Mathwig and noted that Core was "winding up the 'feasibility' portion." (Vehrs Decl. ¶ 2, Ex. 22.) MSI adopted the ESOP plan document on December 30, 2014. (McNary Decl. ¶ 3.i, Ex. 9.) This was before the Second Consulting Agreement's term ended, but some matters relating to this agreement were still in progress in March 2015. (Vehrs Decl. ¶ 2, Ex. 23.) MSI has paid the $60,000 in fixed fees under the First and Second Consulting Agreements. (*See* Compl. ¶ 12; Doc. No. 47 ("Am. Answer") ¶ 12.) The consulting agreements are governed by North Dakota law. (*See* 1st CA ¶ 12; 2nd CA ¶ 12.)

## III.   Additional Fees

As Core's consulting work continued, the parties discussed additional fees and services on numerous occasions. On November 2, 2014, Mohagen sent Steve Zenz ("Zenz"), a member of MSI's board of advisors, a fee estimate. (McNary Decl. ¶ 3.a, Ex. 1; Vehrs Decl. ¶ 2, Ex. 6.) Including the First Consulting Agreement's $35,000 fixed

fee, this anticipated fee estimate ranged from $105,000 to $127,500.  (Vehrs Decl. ¶ 2, Ex. 6; McNary Decl. ¶ 3.r, Ex. 18.)  Mohagen noted that "it is extremely difficult if not impossible to provide an 'estimated fee'" partly because of "the high number of potential issues to be addressed."  (Vehrs Decl. ¶ 2, Ex. 6.)  He also noted that "if any issues arise in the feasibility analysis, those issues will be resolved outside of a 'simplified' ESOP formation."  (*Id.*)  On November 3, 2014, Zenz e-mailed Mathwig and told him he "let [Mohagen] know we are okay with the feasibility fee and that we want to know in advance if he is going to do anything with an additional fee."  (Vehrs Decl. ¶ 2, Ex. 25.)

On March 13, 2015, Mohagen e-mailed Zenz another fee estimate indicating fees of $395,000 plus at least an additional $122,500.  (Vehrs Decl. ¶ 2, Ex. 5.)  On March 14, 2015, Zenz responded to Mohagen's e-mail, noting that he "was expecting the all-in fee would be around $300k, maybe $350k" and stating that he was "very concerned" about the high fee estimate.  (*Id.*)  On March 25, 2015, Mohagen sent Mathwig an e-mail and attached an anticipated fixed fee schedule for additional services in response to a request from MSI.  (Vehrs Decl. ¶ 2, Ex. 6.)  The estimated fees totaled $532,500, including the $60,000 already paid.  (*Id.*)

## IV.    Additional Services

As the engagement continued, Core proposed additional consulting agreements beyond those signed by the parties.  On March 25, 2015, Mathwig sent a proposed Consulting Agreement for services totaling $7,500 to be executed from March 2, 2015 through April 30, 2015.  (Vehrs Decl. ¶ 2, Ex. 7.)  On April 20, 2015, Mohagen e-mailed three new proposed consulting agreements, which were to account for work from

March 2, 2015 until June 30, 2015.  (Vehrs Decl. ¶ 2, Ex. 11.)  The additional fees

proposed in these agreements totaled $180,000.  (*Id.*)  Then, Mathwig e-mailed five more

proposed consulting agreements on April 23, 2015, totaling $285,000.  (Vehrs Decl. ¶ 2,

Exs. 12, 13.)  The term of these proposed agreements also began on March 2, 2015.  (*Id.*)

Mohagen noted on both April 20, 2015 and April 23, 2015 that Core had already

"engaged in significant services related to each of the attached [consulting agreements]."

(Vehrs Decl. ¶ 2, Ex. 11; Vehrs Decl. ¶ 2, Ex. 13.)

MSI did not sign any of the additional proposed consulting agreements. (McNary

Decl. ¶ 3.w, Ex. 23.)  However, the parties dispute whether Mathwig promised to do so.

In his deposition, Mohagen asserted that he had a conversation with Mathwig on April 7,

2015, and Mathwig "agreed to all the engagement letters that were the product of the

[fixed fee] schedule that he had been provided."  (Vehrs Decl. ¶ 2, Ex. 38 ("Second

Mohagen Dep.") at 17:24-18:6.)  On April 8, 2015, Mohagen wrote to Zenz that "Jerry

[Mathwig] did agree to sign engagement agreements and pay fees as we go."  (Vehrs

Decl. ¶ 2, Ex. 10.)  Mathwig does not deny that a phone call occurred on April 7, 2015,

but he asserts that he "made no such promise," and noted that he "had not even seen the

other proposed agreements as of the date of that phone call."  (Doc. No. 66 ("Mathwig

Decl.")  ¶¶ 5, 6.)

It is also disputed whether MSI knew Core was undertaking additional services

beyond the scope of the First and Second Consulting Agreements.  Mohagen testified that

he informed Mathwig about such services and fees in "personal meetings" or "telephone

conferences."  (Vehrs Decl. ¶ 2, Ex. 37 ("Mohagen Dep.") at 48:3-24.)  Additionally, at

least some agenda items and communications appear to include items not explicitly listed in either of the two signed Consulting Agreements.  For example, a February 2, 2015 agenda included "NA Trading" and "Treatment of AAA"—both of which were not specifically listed in either of the signed Consulting Agreements.  (McNary Decl. ¶ 3.j, Ex. 10; *see* 1st CA; 2nd CA.)  On February 17, 2015, Mohagen also e-mailed Mathwig a summary of anticipated services for moving forward and indicated that some services would be completed immediately.  (Vehrs Decl. ¶ 2, Ex. 22.)

However, on March 13, 2015, Mohagen wrote to Zenz that "Core anticipates entering into Consulting Agreements prior to material services being initiated on a particular project within the confines of the overall engagement."  (Vehrs Decl. ¶ 2, Ex. 5.)  And on March 25, 2015, Mohagen wrote to Mathwig that the First and Second Consulting Agreements for fees of $35,000 and $25,000 "have been engaged, initiated and completed, therefore the services [sic] fees have been set and paid.  The remaining services have not as of yet been engaged."  (Vehrs Decl. ¶ 2, Ex. 6.)

## V.    "Halt All Work" Instruction and Termination of the Relationship

On May 6, 2015, the relationship between MSI and Core quickly deteriorated when Mathwig sent Mohagen an instruction "to halt all work until I approve a restart" and "to bill all work that has been done so far."  (Vehrs Decl. ¶ 2, Ex. 15.)  In response, Mohagen sent an e-mail to Mathwig and Zenz regarding Mathwig's instruction to "halt all work."  (McNary Decl. ¶ 3.w, Ex. 23.)  His e-mail included a statement reminding Mathwig that "Core sent you, personally and MSI a schedule . . . of the Projects to be

undertaken with regard to this Engagement and the anticipated cost/benefit of individual Projects." (*Id.*)

On May 12, 2015, Mathwig wrote another e-mail stating that he expected "the Valuation Process to be completed fully and not excluded." (Vehrs Decl. ¶ 2, Ex. 15.) However, on June 16, 2015, Mathwig sent another e-mail ending the relationship between Core and MSI. (Vehrs Decl. ¶ 2, Ex. 20.) On June 25, 2015, Mohagen e-mailed Mathwig the signed Consulting Agreements along with eight "[i]nvoices for Core services provided outside Exhibit 1 of the attached CA's billed at Core's standard hourly rates." (Vehrs Decl. ¶ 2, Ex. 21.) The invoices totaled $207,032.50. (*Id.*)

## VI.    Procedural Background

On August 7, 2015, MSI commenced this action. (Compl.) In the Complaint, MSI asserts the following claims: (1) breach of fiduciary duty (Count I); and (2) declaratory judgment pursuant to 28 U.S.C. § 2201(a) (Count II). (*Id.* ¶¶ 30-38.) MSI seeks the following relief: (1) $60,000 as damages for its breach-of-fiduciary-duty claim; (2) an award of costs and attorney fees; (3) a declaration that MSI is not obligated to Core Consulting to pay $207,032.50 in additional fees; (4) a declaration that the First and Second Consulting Agreements are unconscionable and void; and (5) other relief the court deems appropriate. (*Id.* at Prayer for Relief.)

On March, 1, 2016, Defendants filed an Amended Answer and Counterclaim. (Am. Answer.) Core asserts the following counterclaims against MSI: (1) breach of contract under the First and Second Consulting Agreements (Count I); (2) unjust enrichment (Count II); (3) promissory estoppel (Count III); and

(4) deceit/misrepresentation (Count IV).  (*Id.* ¶¶ 90-117.)  Core seeks the following relief:

(1) dismissal of MSI's Complaint with prejudice; (2) $207,032.50 plus interest; (3) an

award of costs and attorney fees; and (4) other relief the court deems equitable.[2]  (*Id.* at

Prayer for Relief.)  The Court provides additional facts as they are relevant to the claims

and issues analyzed below.

## DISCUSSION

## I.    MSI's Motion for Summary Judgment

MSI asserts it is entitled to summary judgment on all claims before the Court,

including its own claims for declaratory judgment and breach of fiduciary duty as well as

Core's breach of contract, promissory estoppel, unjust enrichment, and deceit

counterclaims.  Defendants, on the other hand, contend that genuine issues of material

fact preclude summary judgment in MSI's favor.

### A.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574

F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

---

[2]    For simplicity, the Court refers to Core and Mohagen collectively as "Defendants"
throughout this order.  To the extent the Court references "Defendants'" counterclaims,
the Court acknowledges that these claims are brought by Core only and not Mohagen.

Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### B.    Declaratory Judgment and Breach of Contract

MSI contends that it is entitled to a declaratory judgment to resolve the parties' actual dispute over MSI's obligation to pay invoices totaling $207,032.50. Accordingly, MSI also argues that it is entitled to summary judgment on Defendants' counterclaim for breach of contract. First, MSI argues that the parties' contracts—the First and Second Consulting Agreements—plainly required Core to provide notice to MSI if any requested services went beyond the existing agreements. Second, MSI contends that there is no evidence that such notice was provided, absent Mohagen's self-serving testimony. MSI further asserts that it had no reason to believe services were being performed outside of the First and Second Consulting Agreements. In particular, MSI argues that Mohagen's February 17, 2015 e-mail could not have provided notice because it stated that Core was

"winding up the 'feasibility' portion of our engagement," and working on an outline of issues not yet addressed. (Doc. No. 76 at 6 (quoting Vehrs Decl. ¶ 2, Ex. 22).) MSI points out that it is not relevant if MSI should have known that additional services were being provided beyond the scope of the existing agreements because Core had an obligation to provide actual notice.

Defendants assert that summary judgment on MSI's declaratory judgment claim is improper.[3] First, Defendants suggest that the Consulting Agreements contain no requirement that Core provide *advance* notice of services falling outside the scope of the agreements. Second, Defendants identify "several instances of Core notifying MSI of services not described in the two executed Consulting Agreements." (Doc. No. 73 at 19.) For example, Defendants point out that Mathwig participated in weekly conference calls relating to the ESOP transaction even after the ESOP document was adopted. In addition, Defendants point to Mohagen's testimony that Mathwig was informed of outside services "[o]n a number of occasions." (*Id.* at 19-20.) Defendants also identify conference call agendas that cover topics outside the scope of the First and Second Consulting Agreements and point out that conference calls nearly always included discussions of fees and projects. Defendants also note that Mohagen explained via e-mail on February 17, 2015 that he would "continue to address matters requiring immediate

---

[3]    Defendants do not frame their argument on this issue as a challenge to MSI's Motion for Summary Judgment on Defendants' breach-of-contract counterclaim. MSI therefore argues that Core's "failure to respond as to their own breach-of-contract claim may be deemed a concession that judgment is appropriate on that portion of their case." (Doc. No. 76 at 3.) In light of the overlapping nature of these claims, the Court construes Defendants' response to address both claims.

attention" after describing many services that were not yet engaged. (*Id.* at 20 (quoting Vehrs Decl. ¶ 2, Ex. 22).) In short, Defendants argue that genuine issues of material fact remain, precluding summary judgment.

The Court first notes the apparent dispute between the parties over the proper framing of the issues under these claims. With respect to its own declaratory judgment claim and Core's breach-of-contract counterclaim, MSI focuses on the invoices totaling $207,032.50. However, MSI points out that Mohagen testified Defendants sent the invoices totaling $207,032.50 to MSI to attempt to settle Core's claimed entitlement to the additional fixed fees under the unsigned Consulting Agreements. In responding to MSI's declaratory judgment claim, Defendants assert that "MSI asks the Court to declare that MSI owes *no additional fees* to Core for consulting services," not specifically referencing the $207,032.50 invoice figure. (Doc. No. 73 at 18 (emphasis added).) Notwithstanding the parties' inconsistent framing of the issues under these claims, the Court interprets MSI's declaratory judgment claim as seeking to resolve the parties' dispute over MSI's liability to Core for $207,032.50 under the First and Second Consulting Agreements—the only signed contracts between the parties. The Court will thus analyze these claims by focusing on this disputed issue.

Under North Dakota law, "[a] breach of contract is the nonperformance of a contractual duty when it is due." *Welch Const. & Excavating, LLC v. Duong*, 2016 ND 70, ¶ 5, 877 N.W.2d 292, 294 (quoting *WFND, LLC v. Fargo Marc, LLC*, 2007 ND 67, ¶ 13, 730 N.W.2d 841, 848). The following three elements must be established: "the existence of a contract, a breach of the contract, and damages flowing from the breach."

*Id.*  The burden rests on the party who has asserted a breach-of-contract claim.  *Serv. Oil,*

*Inc. v. Gjestvang*, 2015 ND 77, ¶ 15, 861 N.W.2d 490, 496.

   Construing a written contract is generally a question of law.  *Welch Const.*, 2016

ND 70, ¶ 6, 877 N.W.2d at 294.  Contract terms should "be understood in their ordinary

and popular sense rather than according to their strict legal meaning, unless used by the

parties in a technical sense, or unless a special meaning is given to them by usage, in

which case the latter must be followed."  N.D. Cent. Code § 9-07-09 (2017).  Dictionaries

provide a useful aid because "[t]he ordinary meaning is the definition a non law-trained

person would attach to the term."  *Martin v. Allianz Life Ins. Co. of N. Am.*, 1998 ND 8,

¶ 12, 573 N.W.2d 823, 826.  A contract should be interpreted as a whole, with every

clause being used "to help interpret the others."  N.D. Cent. Code § 9-07-06 (2017).

   Whether a contract has been breached is a question of fact.  *Welch Const.*, 2016

ND 70, ¶ 5, 877 N.W.2d at 294.  If a party seeks to establish the existence of an oral

agreement by testimony, a court should not "resolve disputed issues of material fact as to

the terms of the contract" at the summary judgment stage.  *Martin Const., Inc. v.*

*Concrete Strategies, LLC*, 2016 WL 4218591, at *2 (D.N.D. Mar. 23, 2016).  Further,

"[n]otice is a question of fact, which is generally inappropriate for summary judgment."

*Van Sickle v. Hallmark & Assocs., Inc.*, 2008 ND 12, ¶ 17, 744 N.W.2d 532, 538

(quotation marks and citation omitted).

   To be recoverable, damages must be "clearly ascertainable in both their nature and

origin."  *Serv. Oil, Inc.*, 2015 ND 77, ¶ 16, 861 N.W.2d at 496 (quoting N.D. Cent. Code

§ 32-03-09).  Although "mere uncertainty in the exact amount of damages will not

preclude recovery when obvious damages were suffered or reasonably certain substantial

damages have resulted," recovery is precluded where there is "uncertainty as to the fact

of damages, rather than the amount." *Id.*  A court may conclude that the "fact of

damages" is uncertain, for example, based on a lack of inventories relevant to the claimed

damages. *See id.* at ¶¶ 20-21, 497-98.

Both the First and Second Consulting Agreements include an attached "Exhibit 1"

which outlines the "specific consulting and advisory services to be provided by [Core]"

pursuant to the agreement.  (1st CA ¶ 1 & Ex. 1; 2nd CA ¶ 1 & Ex. 1.)  The agreements

provide:

> During the term of this Agreement, [MSI] may engage [Core] to complete
> consulting and advisory services which are outside the scope of services
> outlined in Exhibit 1. . . . When [MSI] engages [Core] to provide additional
> services under the terms of . . . this Agreement, whether or not [Core]
> provides [MSI] with a written outline of the services to be completed and
> the fees to be charged by [Core] for these additional services, additional
> services shall be provided under the terms of this Agreement at standard
> hourly rates. If these additional services take longer than the term of this
> Agreement to be completed, this Agreement shall continue to be in effect
> until the completion of these additional services by [Core].

(1st CA ¶ 1; 2nd CA ¶ 1.)  With respect to fees, the agreements state:

> [MSI] agrees that the fees quoted for this Agreement are for the services
> outlined in Exhibit 1 of this Agreement only and do not include services
> that may be required or engaged for with [Core] outside of the services
> summarized in Exhibit 1 . . . .  [Core] will notify [MSI] verbally or in
> writing when requested consulting services fall outside of the services
> rendered pursuant to Exhibit 1 . . . .

(1st CA ¶ 2; 2nd CA ¶ 2.)  Under a provision addressing termination, the First Consulting

Agreement states:

> The term of this Agreement shall commence October 30, 2014, and terminate January 15, 2015, unless extended by ongoing services as outlined under Section 1 of this Agreement.  The Agreement may be terminated by either party upon written notice if the other party breaches any of its obligations hereunder and the breaching party fails to cure such breach within thirty (30) days after receipt of notice of such breach. . . .
>
> If [MSI] elects to terminate this Agreement at any time after thirty (30) days from the execution of this Agreement, [MSI] shall be obligated to pay the fees enumerated in Section 2 of this Agreement and any fees agreed to on engagements falling outside of the services summarized in Exhibit 1 . . . .

(1st CA ¶ 5.)  The Second Consulting Agreement contains an identical provision except for the term which "shall commence December 8, 2014, and terminate January 30, 2015." (2nd CA ¶ 5.)

The Court first concludes that the First and Second Consulting Agreements unambiguously require Core to provide advance notice of services being provided outside the scope of the existing agreements.  Both agreements plainly state that "[Core] will notify [MSI] verbally or in writing when requested consulting services fall outside of the services rendered pursuant to Exhibit 1."  (1st CA ¶ 2; 2nd CA ¶ 2.)  There is no indication that the use of the term "notify" in this provision should be construed according to its "strict legal meaning," "in a technical sense," or in accordance with a "special meaning."  *See* N.D. Cent. Code § 9-07-09.  Understood in its "ordinary and popular sense," *see id.*, "notify" means, in relevant part, "to give notice of or report the occurrence of."  *Notify*, Merriam-Webster, http:// www.merriam-webster.com/dictionary/notify (last visited July 20, 2017).  In turn, the first-listed definition of "notice" is "warning or intimation of something."  *Notice*, Merriam-

Webster, http://www.merriam-webster.com/dictionary/notice (last visited July 20, 2017).

Consistent with these definitions, the Court concludes that the requirement to "notify"

MSI most sensibly requires prior notice which would warn MSI and permit it to evaluate

whether or not to engage such additional services.  The Court acknowledges that the

word "notify" may refer to prior notice or notice provided after the fact.  When read in

context, however, the Court concludes that the commonsense reading of this provision

requires advance notice.  *See* N.D. Cent. Code Ann. § 9-07-06 (providing that contracts

should be read as a whole).

Second, the Court concludes that a genuine issue of material fact exists regarding

whether Core notified MSI in advance that the additional services being provided were

beyond the scope of the First and Second Consulting Agreements.  In particular,

Mohagen testified in his deposition as follows:

> THE COURT REPORTER:  "Did you tell him in each conversation that you had
> with him starting in December that you were undertaking work outside of the
> agreements that he had already signed?"
>
> [Mohagen]:  No.
>
> [Counsel for MSI]:  Did you ever tell him that?
>
> [Mohagen]:  I believe we told him at a number of occasions.
>
> [Counsel for MSI]: When?
>
> [Mohagen]:  I think if you look at every agenda for every phone conference there's
> always a discussion about fees and billings.  Every Steve Zenz prepared agenda.
>
> [Counsel for MSI]:  So you're saying it was in personal meetings when you told
> him that you were undertaking work already outside the scope of the two signed
> consulting agreements?

[Mohagen]:  Yes.  And/or in telephone conferences.

[Counsel for MSI]:  Was it in every one?

[Mohagen]:  I don't know that it was in every one.  I don't recall.

(Mohagen Dep. at 48:3-24.)

While the evidence to support Defendants' position is slim, the Court cannot hold on this record that Core undisputedly failed to notify MSI of services being engaged beyond the scope of the First and Second Consulting Agreements.  MSI agreed to a contract provision whereby Core could give *verbal* notice of requested services falling outside the scope of the written agreements.  The record establishes that the parties engaged in frequent verbal communications throughout the course of their business relationship.  By not contracting for written notification only, Mathwig and MSI took the risk that disputes relating to this provision may be resolved via conflicting testimony.  To hold that Mohagen's sworn testimony is insufficient to establish that Core in fact notified MSI would be inconsistent with the terms agreed upon by the parties.  A jury could reasonably conclude that MSI was notified in advance that Core was providing services beyond the scope of the First and Second Consulting Agreements.  Therefore, MSI's Motion for Summary Judgment is denied with respect to its declaratory judgment claim and MSI's breach-of-contract counterclaim.

The Court notes, however, that Core may have difficulty establishing its damages with respect to its breach-of-contract claim in light of the limited evidence in the record regarding the nature and timing of the notice given and the particular "additional services" agreed upon by the parties.  To support their claimed entitlement to additional

17

fees, Defendants must clearly establish that particular work identified in the invoices totaling $207,032.50 was both (1) beyond the scope of the existing agreements and (2) agreed upon by the parties following Core's timely notification.

### C.    Promissory Estoppel

MSI argues that Defendants' promissory estoppel counterclaim should be dismissed because Mathwig's purported promise was not sufficiently definite as to essential terms, and Defendants could not have justifiably relied on this promise with respect to work performed before the alleged promise.  According to MSI, Mohagen's February 17, 2015 e-mail did not include many of the services eventually identified in the proposed consulting agreements.  In addition, the March 25, 2015 Services Summary e-mail was only a draft proposal which did not include contract terms, a clear description of services to be provided, or fixed fees.  Even assuming Mathwig agreed to sign the consulting agreements he had not yet seen, MSI argues, Defendants' promissory estoppel claim must fail because the essential terms were unknown at the time of the alleged April 7, 2015 promise.  MSI also argues that Defendants have failed to establish that they substantially changed their position as a result of Mathwig's alleged promise.  MSI contends that there is no injustice to Core in dismissing this claim.

According to Defendants, Mathwig agreed to sign the consulting agreements described in the March 25, 2015 Services Summary e-mail and pay the related fees. Mohagen asserts that Mathwig knew the provisions included in the unsigned consulting agreements would be the same as those included in the First and Second Consulting Agreements.  Defendants also assert that Mathwig was aware of the services being

18

proposed because they had been previously communicated via e-mail on February 17, 2015. Thus, Defendants argue, MSI knew all of the essential terms of the agreements Mathwig agreed to sign prior to his April 7, 2015 oral promise. Defendants argue that their continued performance in reliance on Mathwig's promise and expectation of compensation was justifiable. Defendants assert that they had a reasonable belief that MSI would execute the consulting agreements and pay the related fees if Core continued to perform services for MSI. Defendants argue that Mathwig's promise must be enforced to avoid the injustice of Core going without compensation for months of work performed for MSI.

A claim of promissory estoppel requires a party to establish the following four elements: "1) a promise which the promisor should reasonably expect will cause the promisee to change his position; 2) a substantial change of the promisee's position through action, or forbearance; 3) justifiable reliance on the promise; and 4) injustice which can only be avoided by enforcing the promise." *Valentina Williston, LLC v. Gadeco, LLC*, 2016 ND 84, ¶ 25, 878 N.W.2d 397, 404 (quoting *Univ. Hotel Dev., L.L.C. v. Dusterhoft Oil, Inc.*, 2006 ND 121, ¶ 11, 715 N.W.2d 153, 157). Failure on one element precludes a promissory estoppel claim and renders it unnecessary to evaluate the remaining elements. *Erickson v. Brown*, 2012 ND 43, ¶¶ 19-20, 813 N.W.2d 531, 536-37.

Under North Dakota law, in order for a promise to support a promissory estoppel claim it "must be clear, definite, and unambiguous as to essential terms." *Valentina Williston*, 2016 ND 84, ¶ 25, 878 N.W.2d at 404 (quotation marks and citation omitted).

"A promise is too indefinite for reasonable enforcement when a party retains the right to determine the extent of his performance." *Id.* A court should consider whether "[t]he terms of the agreement . . . were . . . preliminary," or if "the parties simply agree[d] to negotiate the remaining terms in the future." *Knorr v. Norberg*, 2015 ND 284, ¶ 14, 872 N.W.2d 323, 327; *see also Erickson*, 2012 ND 43, ¶ 16, 813 N.W.2d at 536 (noting that the requirement of a clear and definite promise "arises from a reluctance to enforce incomplete agreements based upon preliminary negotiations and discussions or upon an agreement to negotiate the remaining terms of a contract in the future" (quotation marks and citation omitted)).

Promissory estoppel "involve[s] questions of fact." *Knorr*, 2015 ND 284, ¶ 7, 872 N.W.2d at 326. However, summary judgment is proper where a party fails to establish that "a specific promise" was made with respect to "an essential term" such as the amount of payment. *Dusterhoft Oil, Inc.*, 2006 ND 121, ¶¶ 18, 20, 715 N.W.2d at 158; *see also Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352, 357-58 (N.D. 1986) (affirming summary judgment in favor of the defendant where "the parties failed to agree to or even discuss many essential terms of the oil and gas lease").

On February 17, 2015, Mohagen sent Mathwig an e-mail stating that Core was "working on an outline (generally a game plan)" of engagements and issues yet to be agreed upon. (Vehrs Decl. ¶ 2, Ex. 22.) The e-mail noted that such issues were "to include but not limited to" multiple enumerated services. (*Id.*) On March 13, 2015, Mohagen sent Zenz an "'anticipated' fixed fee schedule." (Vehrs Decl. ¶ 2, Ex. 5.) Mohagen explained that "[o]nly upon Core and MSI entering into a Consulting

Agreement for a particular project will the Core fees for that project become 'fixed' as to amount." (*Id.*) Further, Mohagen noted that "Core anticipates entering into Consulting Agreements prior to material services being initiated on a particular project within the confines of the overall engagement." (*Id.*) In response, Zenz e-mailed Mohagen to suggest Core "take a hard look" to determine if it was possible "to substantially reduce the estimate." (*Id.*) Mohagen responded on March 15, 2015, suggesting that they "discuss the fee issues and Jerry's lates [sic] voice mail." (*Id.*)

On March 25, 2015, Mohagen e-mailed Mathwig and Zenz a Services Summary spreadsheet, including a general description of services and fees relating to MSI's ESOP Implementation. (Vehrs Decl. ¶ 2, Ex. 6.) The spreadsheet included both completed services under the First and Second Consulting Agreements as well as other services and fees indicated "to be Engaged, Initiated and Completed." (*Id.*) Projects in the latter category were designated as either "Required" or "Elective." (*Id.*) Mohagen's e-mail noted that the "Estimated Actual Core Fixed Fee" noted on the spreadsheet "is a fee 'estimate' subject to revision until Core issues a Consulting Agreement indicating specific services and a fixed fee for these specific services." (*Id.*) Mohagen asked Mathwig to respond after reviewing the Services Summary to arrange an opportunity to discuss it over the phone. (*Id.*) Also on March 25, 2015, Mohagen sent Mathwig a proposed consulting agreement relating to the appointment of transactional trustees. (Vehrs Decl. ¶ 2, Ex. 7.)

According to Mohagen's deposition testimony, in an April 7, 2015 phone call, Mathwig "agreed to sign all the engagement agreements" and agreed to all related fees.

(Mohagen Dep. at 7:25-8:22.)  Specifically, Mohagen testified that Mathwig "agreed to sign the engagement agreements that were to be drafted following the schedule that he had received on . . . March 25." (*Id.* at 43:3-18.)  Mohagen acknowledged that he had not sent all of the consulting agreements to MSI at the time of the telephone call.  (*Id.* at 43:19-24; *see also id.* at 50:3-6 ("He agreed to sign all the consulting agreements which were going to be prepared, and he agreed to all the fees that were on the schedule that was sent to him on March 25.").)  Mohagen also testified that Mathwig agreed to the specific payment terms that were eventually included in the consulting agreements.  (*Id.* at 51:11-14.)  Mohagen acknowledged that some terms were not discussed such as termination or confidentiality.  (*Id.* at 51:15-52:13.)  Mohagen agreed that those terms were "material."  (*Id.* at 52:14-16.)  In his declaration, Mohagen asserted that "Mr. Mathwig understood that the material terms of the proposed consulting agreements would be the same as the two Consulting Agreements previously signed by Mr. Mathwig on behalf of MSI."  (Doc. No. 74 ("Mohagen Decl.") ¶ 5.)  In particular, Mohagen explained that "Mr. Mathwig understood from our conversation that only the flat fee amounts and the 'Exhibit 1' description of services would differ from the Consulting Agreements previously consummated."  (*Id.*)

Mathwig testified that he did not recall the April 7, 2015 telephone conversation.  (Mathwig Dep. at 222:9-16.)  In his declaration, Mathwig asserted that he did not make the promise Mohagen described in the April 7, 2015 phone call.  (Mathwig Decl. ¶¶ 5-6.)  Mathwig explained that "I had not even seen the other proposed agreements as of the date

of that phone call.  I had no clear understanding of what Mr. Mohagen was all proposing for MSI."  (*Id.* ¶ 6.)

On April 8, 2015, in response to an e-mail from Zenz inquiring whether Mohagen and Mathwig had discussed fees, Mohagen wrote:

> We did resolve the fee issue.  Jerry wants to wait until the end and see if there is any "room" for a "discount" (Jerry's idea).  Not sure that this isn't "kicking the can down the road" however Jerry did agree to sign engagement agreements and pay fees as we go. . . .  Jerry did ask me to copy both you and David on the engagement agreements primarily for the purpose of reminding him to sign the agreements and also to make sure we are following the services summary.

(Vehrs Decl. ¶ 2, Ex. 10.)

On April 20, 2015, Mohagen re-sent Mathwig the transactional trustee consulting agreement along with three additional consulting agreements, noting that the fees in the agreements "follow the Services Summary – Metro Sales, Inc. ESOP Implementation ('Schedule') schedule previously provided for your review and comment."  (Vehrs Decl. ¶ 2, Ex. 11.)  On April 23, 2015, Mohagen sent Mathwig five more consulting agreements.  (Vehrs Decl. ¶ 2, Exs. 12, 13.)  Mohagen again noted that the fees in these consulting agreements were consistent with the Services Summary, "with the exception of the NA Trading Stock Purchase Transaction which was not contemplated at the time the Schedule was prepared and sent to you for review."  (Vehrs Decl. ¶ 2, Ex. 13.)  Later that same day, an MSI representative e-mailed Mohagen asking for an Excel file version of the Services Summary so that he could "enter all of the amounts associated with the consulting agreements you've sent, how much needs to be paid and when, etc."  (McNary Decl. ¶ 3.t, Ex. 20.)  On May 12, 2015, Mohagen wrote Mathwig via e-mail: "Although

there has been verbal agreement as to MSI signing the Core provided CA's [sic] for each of the Projects and further a follow up e-mail request to sign the CA's [sic], at this point Core has not received signed CA's [sic]."  (McNary Decl. ¶ 3.w, Ex. 23.)

The Court concludes that Defendants have failed to establish the existence of a promise that is sufficiently "clear, definite, and unambiguous as to essential terms." *Valentina Williston*, 2016 ND 84, ¶ 25, 878 N.W.2d at 404 (citation omitted).  The Court acknowledges that there are disputed facts in the record, but these disputes are not material for resolving MSI's motion.  Even if Mathwig made the oral promise Defendants identify, this promise is "too indefinite for reasonable enforcement" because the actual services Core was agreeing to provide had not been identified in detail.  *See id.*  The Services Summary and prior e-mail communications between the parties were preliminary in nature and subject to revision.  Importantly, the Services Summary provides only very general descriptions of the categories of services Mohagen intended to perform for MSI.  Following the April 7, 2015 telephone call, Mohagen retained full discretion to outline the specific scope of services to be provided in the remaining consulting agreements.  This is precisely the type of indefinite and preliminary agreement North Dakota courts decline to enforce.  *See id.* ("A promise is too indefinite for reasonable enforcement when a party retains the right to determine the extent of his performance."); *Erickson*, 2012 ND 43, ¶¶ 17-19, 813 N.W.2d at 536-37 (declining to enforce a promise that, even if made, was "an incomplete promise based upon preliminary negotiations and discussions"); *see also Lohse*, 389 N.W.2d at 357.  Even if Mathwig understood the general services to be provided and the associated fees, his

24

alleged oral promise to sign multiple consulting agreements he undisputedly had not seen is insufficient to support Defendants' promissory estoppel counterclaim.[4]  The Court therefore grants MSI's motion with respect to this claim.

### D.    Breach of Fiduciary Duty

MSI also asserts a claim for breach of fiduciary duty, arguing that Mohagen breached fiduciary duties owed to MSI based on Mohagen's role as an attorney, accountant, and expert in ESOP transactions.  MSI argues that it is entitled to summary judgment on this claim and seeks an award of reimbursement for the $60,000 it has paid to Core under the First and Second Consulting Agreements.  Defendants assert that summary judgment should not be granted in MSI's favor and propose instead that the

---

[4]    The record reflects that Mathwig received one proposed consulting agreement on March 25, 2015 relating to "Director & Transactional Trustee Appt."  (Doc. No. 67 "Vehrs Decl." ¶ 2, Ex. 7.)  Although Mathwig's alleged promise may be clearer and more definite with respect to this particular consulting agreement which he had in fact received prior to the April 7, 2015 telephone conversation, the Court nonetheless concludes that MSI is entitled to summary judgment with respect to this consulting agreement as well.

The fixed fee associated with this consulting agreement is $7,500.  (*Id.*)  Core's invoice relating to "Appointment of ESOP Trustees and Directors" identifies a total amount due of $6,836.25.  (Vehrs Decl. ¶ 2, Ex. 21.)  However, $5,936.25 out of this total is associated with work predating Mathwig's alleged April 7, 2015 promise.  (*Id.*)  Only $900 (associated with 2.5 hours of work) is identified as being performed after April 7, 2015.  (*Id.*)

As a matter of law, the Court concludes that this evidence is insufficient to support that there was "a substantial change in [Core's] position through action or forbearance" following Mathwig's alleged promise as it pertains to the "Director & Transactional Trustee Appt" consulting agreement.  *See Dalan v. Paracelsus Healthcare Corp. of N.D., Inc.*, 2002 ND 46, ¶¶ 11, 16-18, 640 N.W.2d 726, 728, 731-32 (affirming summary judgment dismissal of the plaintiff's promissory estoppel claim where the plaintiff failed to establish a substantial change in position).  Thus, Defendants' promissory estoppel claim is properly dismissed in its entirety.

Court should consider summary judgment dismissal of this claim for failure to establish evidence on each essential element.

MSI argues that it sought Core and Mohagen's services because Mathwig and his employees had no experience in ESOP formation.  Because Mohagen held himself out as an expert in this area and knew that MSI was relying on his expertise, MSI argues that a fiduciary relationship existed based on Mohagen's consulting role.  MSI also argues that Mohagen had a fiduciary relationship to MSI based on his roles as an attorney and an accountant and his use of legal and accounting knowledge in advising MSI.  According to MSI, even though Mohagen claimed he was not acting in his capacity as an attorney in providing services to MSI, the parties undisputedly had an attorney-client relationship.  In particular, MSI asserts that Defendants' expert witness designated to testify regarding the existence of an attorney-client relationship should not be permitted to testify, so Defendants will not be able to raise any genuine issues of material fact regarding this issue.  MSI also suggests that a disclaimer that an attorney-client relationship does not exist cannot be relied upon when legal services are actually provided.  MSI argues that it is entitled to summary judgment because Defendants breached their fiduciary duties as a matter of law by providing services pursuant to a conflict of interest.  Specifically, MSI contends that Core impermissibly represented both the buyers and the sellers in the contemplated ESOP transaction as demonstrated by Mohagen's e-mails and invoices.  Citing Minnesota law governing breach of fiduciary duties in the context of an attorney-client relationship, MSI alleges it is entitled to the full $60,000 it has paid to Core for its services.

26

Defendants argue that disputed facts exist relating to numerous aspects of MSI's fiduciary duty claim, including whether there was a fiduciary relationship, the scope of duties owed, whether any such duties were breached, and what damages MSI has suffered. Defendants emphasize that whether an attorney-client relationship exists is ordinarily a question of fact and that the burden is on the party seeking to establish such a relationship. Defendants also suggest that a fiduciary relationship must be established by clear and convincing evidence. Defendants argue that MSI never engaged Mohagen himself to provide services and that Core only provided consulting services not legal services. In particular, Defendants point to the disclaimer language in the First and Second Consulting Agreements which provided that Core was not a law firm and that Core and MSI were not entering into an attorney-client relationship. Defendants also point out that Mohagen's expert witness contradicts MSI's expert witness on this issue. With respect to whether any fiduciary duties were breached, Defendants again point out that this presents a fact question. Defendants also argue that MSI oversimplifies the nature of an ESOP transaction by describing the ESOP trustees as the buyer and the company as the seller. Because the negotiated sale of stock had not yet occurred, Defendants argue, no conflict could have arisen. In addition, Defendants assert that MSI has failed to establish how Core actually represented conflicted parties. Finally, Defendants suggest that MSI is not entitled to the damages it seeks because MSI has not

established that the alleged conflict of interest arose under the scope of services provided

under the First and Second Consulting Agreements for which MSI paid $60,000.[5]

"In order to establish a breach of fiduciary duty, the plaintiff must prove: '1. A

fiduciary relationship between the plaintiff and defendant.  2. A duty by the defendant to

the plaintiffs arising from that relationship.  3. The defendant['s] breach of that duty.

4. Damage to the plaintiffs proximately caused by that breach of duty.'"  *In re Estate of*

*Vendsel*, 2017 ND 71, ¶ 14, 891 N.W.2d 750, 755 (quoting *Meyer v. Maus*, 2001 ND 87,

---

[5]      With respect to MSI's breach-of-fiduciary-duty claim, the parties each cite both
North Dakota and Minnesota law, and neither argues that there is a material conflict
between the laws of these states.  The Court will apply North Dakota law based on the
choice-of-law provisions in the First and Second Consulting Agreements.  (*See* Vehrs
Decl. ¶ 2, Ex. 3 ("1st CA") ¶ 12; Doc. No. 1 ("Compl.") ¶ 9, Ex. B ("2nd CA") ¶ 12
("This Agreement will be governed by and interpreted in accordance with the substantive
laws of the State of North Dakota without reference to conflicts of law.").)
        Federal courts sitting in diversity apply the forum state's choice of law rules, *Nw.
Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997), and
"Minnesota traditionally enforces parties' contractual choice of law provisions" absent
evidence of bad faith or "an intent to evade the law," *Hagstrom v. Am. Circuit Breaker
Corp.*, 518 N.W.2d 46, 48 (Minn. Ct. App. 1994).  The Eighth Circuit has construed a
contractual choice-of-law provision to apply to tort claims under Minnesota law where
"[the] claims are closely related to the interpretation of the contracts and fall within the
ambit of the express agreement that the contracts would be governed by [the chosen
state's] law." *Astraea*, 111 F.3d at 1392.  In particular, the Eighth Circuit has applied a
choice-of-law provision where the non-contract claims "raise[d] issues of performance
and compensation for work done under the . . . contracts."  *Id.*; *see also Warren E.
Johnson Cos. v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1104-08 (D. Minn. 2010)
(discussing *Astraea* and collecting cases that have applied its holding).
        Applying these rules and in light of the parties' express agreement that
North Dakota law would govern the parties' obligations under the First and Second
Consulting Agreements, the Court concludes that MSI's breach-of-fiduciary-duty claim
should be analyzed under North Dakota law.  *See Fla. State Bd. of Admin. v. Law Eng'g
& Envtl. Servs., Inc.*, 262 F. Supp. 2d 1004, 1012-15 (D. Minn. 2003) (following *Astraea*,
applying a choice-of-law clause to a breach-of-fiduciary-duty claim, and noting that
"plaintiff's breach of fiduciary duty claim is related to contract performance").

¶ 14, 626 N.W.2d 281, 286).  The Court concludes that summary judgment in MSI's favor would be premature at this stage as numerous issues of material fact are genuinely disputed.

### 1.    Existence of a Fiduciary Relationship and Duties Owed

First, whether Mohagen owed fiduciary duties to MSI is genuinely disputed by the parties, and this issue presents questions of fact properly resolved at trial.  This dispute involves the first two elements of a fiduciary-duty claim—the existence of a fiduciary relationship and any corresponding duties created by that relationship.

The North Dakota Supreme Court has explained that "[a] fiduciary relationship is something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance . . . ordinarily exercise[d]." *Nesvig v. Nesvig*, 2004 ND 37, ¶ 20, 676 N.W.2d 73, 80 (quotation marks and citation omitted).  "A fiduciary relationship exists when one is under a duty to act for, or to give advice for the benefit of another upon matters within the scope of the relationship." *Id.*  The trusting party "repos[es] confidence" in the fiduciary and "must be in a position of inequality, dependence, weakness, or lack of knowledge." *Snortland v. State*, 2000 ND 162, ¶ 16, 615 N.W.2d 574, 579 (citation omitted).

A fiduciary relationship may arise out of a principal-agent relationship.  *Border Res. LLC v. Irish Oil & Gas, Inc.*, 2015 ND 238, ¶ 18, 869 N.W.2d 758, 764; *see also Burlington N. & Santa Fe Ry. Co. v. Burlington Res. Oil & Gas Co.*, 1999 ND 39, ¶ 17, 590 N.W.2d 433, 437 ("A business agency represents a fiduciary relationship.").  "In a fiduciary relationship, an agent is generally under a duty to act for, or to give advice to, a

29

principal upon matters *within the scope of the relationship* . . . ." *Border Res.*, 2015 ND 238, ¶ 18, 869 N.W.2d at 764 (citation omitted).  Whether an agency relationship exists is a fact question.  *Lagerquist v. Stergo*, 2008 ND 138, ¶ 9, 752 N.W.2d 168, 171.  "Agency is never presumed, and if an agency relationship is denied, the party alleging agency must establish it by clear and convincing evidence."  *Id.* at ¶ 10, 752 N.W.2d at 172 (citation omitted).

Where a fiduciary relationship arises from an agency relationship, "the agent's duties to the principal are determined by the parties' agreement and the nature of the fiduciary relationship."  *Border Res.*, 2015 ND 238, ¶ 18, 869 N.W.2d at 764 (citation omitted); *see also Burlington*, 1999 ND 39, ¶ 15, 590 N.W.2d at 437.  As a general matter, the superior party in a fiduciary relationship "has a duty to act in the dependent party's best interest."  *Nesvig*, 2004 ND 37, ¶ 20, 676 N.W.2d at 80.

In addition, "[a]n attorney-client relationship is a fiduciary relationship."  *Id.*  It is typically a fact question whether an attorney-client relationship exists.  *Moen v. Thomas*, 2001 ND 110, ¶ 13, 628 N.W.2d 325, 329.  In evaluating whether certain conduct constitutes the practice of law, the North Dakota Supreme Court has noted that activities such as "the work of an accountant dissociated from legal advice," "[t]he giving of advice as to investments," and "in making tax returns" are activities that "lie close to the border line and may easily become or be accompanied by practice of the law."  *Cain v. Merchs. Nat. Bank & Trust Co. of Fargo*, 268 N.W. 719, 723 (N.D. 1936).

"An attorney must employ the degree of skill, care, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer . . . ."

30

*Nesvig*, 2004 ND 37, ¶ 20, 676 N.W.2d at 80.  The North Dakota Rules of Professional

Conduct provide that "[a] lawyer shall not represent a client if the lawyer's ability to

consider, recommend, or carry out a course of action on behalf of the client will be

adversely affected by the lawyer's responsibilities to another client or to a third person, or

by the lawyer's own interests."  N.D.R. Prof. Conduct 1.7 (2016).  These rules also apply

to the provision of "law-related services" under specified circumstances.  *See* N.D.R.

Prof. Conduct 5.7 (2006).[6]  A disclaimer that a lawyer is not providing legal services is

not effective where the attorney actually performs legal services.  (*See* Doc. No. 78

("Second Vehrs Decl.") ¶ 2, Ex. 43 (State Bar Ass'n of North Dakota Ethics Comm., Op.

No. 01-03, May 24, 2001).)  The North Dakota Supreme Court has clarified the relevance

of the North Dakota Rules of Professional Conduct in connection with a claim for breach

of fiduciary duty against an attorney, stating that they "are designed to provide guidance

---

[6]      Specifically, Rule 5.7 of the North Dakota Rules of Professional Conduct states:

(a) A lawyer is subject to these Rules with respect to the provision of
law-related services, as defined in paragraph (b), if the law-related services
are provided:
> (1) by the lawyer in circumstances that are not distinct from the
> lawyer's provision of legal services to clients; or
> (2) in other circumstances by an entity controlled by the lawyer
> individually or with others if the lawyer fails to take reasonable
> measures to assure that a person obtaining the law-related services
> knows that the services are not legal services and that the protections
> of the client-lawyer relationship do not exist.

(b) The term "law-related services" denotes services that might reasonably
be performed in conjunction with and in substance are related to the
provision of legal services, and that are not prohibited as unauthorized
practice of law when provided by a nonlawyer.

to lawyers and a structure for regulating conduct through disciplinary agencies, and they are not intended to be a basis for civil liability." *Nesvig*, 2004 ND 37, ¶¶ 1, 23, 66 N.W.2d at 74, 81.[7]

In the context of an attorney-client relationship, "[e]xpert testimony is required generally to establish the standard of care and a breach of the standard of care." *Moen*, 2001 ND 110, ¶ 20 n.4, 628 N.W.2d at 330 n.4 (Maring, J., concurring in part and dissenting in part); *see also Richmond v. Nodland*, 501 N.W.2d 759, 761 (N.D. 1993) ("Generally, expert testimony is necessary to establish the professional's standard of care (duty) and whether the professional's conduct in a particular case deviated from that standard of care (breach of duty)."). This is true unless "the professional's misconduct is so egregious and obvious that a layperson can comprehend the professional's breach of duty without the assistance of expert testimony." *Wastvedt v. Vaaler*, 430 N.W.2d 561, 565 (N.D. 1988). The North Dakota Supreme Court has noted that in matters involving tax planning or other complex circumstances involving specialized knowledge, expert testimony is essential to establish a professional's duty and corresponding breach. *See id.* at 566 ("[E]xcept in rare cases, the nuances and variations of the practice of law make

---

[7]     The Code of Professional Conduct of the American Institute of Certified Professional Accountants, by which North Dakota requires all licensed CPAs to abide, also regulates conflicts of interest. (*See* Vehrs Decl. ¶ 2, Ex. 37 ("Mohagen Dep.") at 117:22-120:23.)

indispensable expert testimony to acquaint the trier-of-fact with the applicable standard of care and any deviation therefrom.").[8]

In his declaration, Mathwig asserts that he had no "direct experience" with ESOPs "and relied on Core and Mohagen's expertise to guide us through the process." (Mathwig Decl. ¶ 3.) The First and Second Consulting Agreements describe Core's areas of expertise and outline the nature of the consulting services to be provided. (1st CA at 1, ¶ 1; 2nd CA at 1, ¶ 1.) Specifically, the Agreements provide that "[Core] shall furnish [MSI] with its best advice, information, judgment and knowledge with respect to matters for which the Consultant has been engaged." (1st CA ¶ 1; 2nd CA ¶ 1.) The Agreements also state, however, that "[MSI] shall be solely responsible for taking action on issues raised and documentation completed by [Core]" and that "[MSI] shall be solely responsible for determining what action and documentation, if any, is necessary and appropriate in addressing issues raised by [Core] during the term of this engagement." (*Id.*)

Regarding the nature of the parties' relationship, the Agreements provide that "[MSI] and [Core] are independent contractors," and that "neither shall have the right or authority to contract in the name of the other nor shall it assume or create any obligations, debts, accounts or liabilities for the other." (1st CA ¶ 8; 2nd CA ¶ 8.) Importantly, the Agreements state that "**[MSI] acknowledges that [Core] is not a law firm and that**

---

[8]     The Court relies on caselaw relating to legal malpractice because the factfinder's ultimate analysis in such cases is similar to the analysis required to evaluate a breach-of-fiduciary-duty claim in the context of an attorney-client relationship. *See Meyer v. Maus*, 2001 ND 87, ¶ 15, 626 N.W.2d 281, 287.

**[Core] and [MSI] will not have an attorney-client relationship.**  If required by the engagement or requested by [MSI], [Core] shall prepare sample documents to be reviewed by [MSI] with its legal counsel." (*Id.* (emphasis in original).)  The Agreements also provide that "[MSI] acknowledges that all legal services related to this Agreement shall be rendered by the Serkland Law Firm . . . or such other law firm licensed to practice law in applicable states agreed to by both [MSI] and [Core]." (*Id.*)  As Defendants note, Mohagen himself had no contractual relationship with MSI separate from the Consulting Agreements between Core and MSI.

MSI's expert on legal ethics, Eric Cooperstein ("Cooperstein"), opines "that Mohagen's work for MSI was subject to the Rules of Professional Conduct" because Mohagen performed legal services and law-related services for MSI.  (*See* Vehrs Decl. ¶ 2, Ex. 28 ("Cooperstein Rep.") at 5-8, 12.)  Cooperstein opines that the disclaimer regarding an attorney-client relationship in the Consulting Agreements was ineffective based on the work actually performed.  (*Id.* at 7.)  Second, Cooperstein suggests that even if Mohagen's services are only characterized as law-related services, the Rules of Professional Conduct would apply.  (*Id.* at 7-8.)  Cooperstein provides the opinion that "[t]he non-legal services provided by Mohagen were undoubtedly law-related services."[9] (*Id.* at 8.)  MSI's expert on ESOP transactions, W. James Vogl, Jr. ("Vogl"), also opines

---

[9]    Cooperstein declined to give weight to the North Dakota State Bar Association's dismissal of the ethics complaint against Mohagen because it "does not include any analysis of the alleged violations of the North Dakota Rules of Professional Conduct." (Vehrs Decl. ¶ 2, Ex. 28 ("Cooperstein Rep.") at 12.)

"that Defendants, and particularly Mr. Mohagen, were performing the role of an attorney on behalf of Metro Sales."  (Vehrs Decl. ¶ 2, Ex. 29 ("Vogl Rep.") at 7.)

Defendants' expert, Duane Lillehaug ("Lillehaug"), offers an opinion on the applicability of the North Dakota Rules of Professional Conduct to Core's services in this matter.  (Vehrs Decl. ¶ 2, Ex. 31 ("Lillehaug Rep.").)  Lillehaug provides the following opinion:

> Pursuant to Rule 5.7, N.D. Rules of Professional Conduct, the Rules of Professional Conduct did not apply to the services provided by Core Consulting Group to Metro Sales, Inc. because any "law-related services," as defined in Rule 5.7(b), N.D.R.Prof.Cond., were provided in circumstances that were distinct from the lawyers provision of legal services to clients and the lawyer took reasonable measures to assure that the person obtaining the legal [sic][10] services knew that the services provided were not legal services and that the protections of the client/lawyer relationship did not exist.

(*Id.* at 1.)  Lillehaug notes that Mohagen's former firm, the Tax Law Office, did not exist when Core provided services to MSI, and that any legal services performed by Mohagen during the relevant time period would have been accomplished through the Serkland Law Firm in which Mohagen had an "of counsel" relationship.  (*Id.* at 2.)  Lillehaug also points out that "Mathwig . . . was an experienced and sophisticated businessman" relying on "independent advisors" throughout the ESOP process.  (*Id.* at 2, 4.)  Lillehaug

---

[10]     Considering Lillehaug's entire report, the Court reads this reference to "legal services" to be a typographical error.  Instead, the Court presumes Lillehaug intended to refer to "services" or "law-related services."  This reading is consistent with Lillehaug's subsequent explanation of this opinion in his report.  (*See* Vehrs Decl. ¶ 2, Ex. 31 ("Lillehaug Rep.") at 4 ("Mr. Mohagen took reasonable measures to assure that Metro Sales and its representatives knew that the Core Consulting services were not legal services and that the protections of the client lawyer relationship did not exist.").)

emphasizes the disclaimer language in the Consulting Agreement relating to Core's limited role, and he suggests that "Mr. Mohagen took reasonable measures to assure that Metro Sales and its representatives knew that the Core Consulting services were not legal services and that the protections of the client lawyer relationship did not exist." (*Id.* at 3-5.)

The Court concludes that the existence of a fiduciary relationship between MSI and Defendants and the scope of any fiduciary duties owed is genuinely disputed on this record. Notably, the parties' competing experts reach divergent conclusions on whether Defendants were subject to the professional responsibility rules governing an attorney-client relationship. Even if the fiduciary relationship arises only out of a general business agency relationship or Mohagen's position as an accountant, the Court concludes that genuine issues of material fact remain regarding the nature of that relationship and the scope of any duties arising from the signed Consulting Agreements or the parties' business relationship. Because it is typically a fact question whether an attorney-client relationship or other fiduciary relationship exists, and in light of the competing evidence on these issues in the record, the Court concludes that MSI has failed to establish that summary judgment in its favor is warranted on this issue.

### 2.      Breach of Fiduciary Duty

Second, even if a fiduciary relationship were established, MSI has failed to demonstrate that Mohagen undisputedly breached a fiduciary duty by engaging in representation pursuant to a conflict of interest in the contemplated ESOP transaction.

36

The Court reaches this conclusion whether Defendants' duty is evaluated on the basis of a general principal-agent fiduciary relationship or an attorney-client relationship.

In cases alleging legal malpractice, a violation of the North Dakota Code of Professional Responsibility "merely constitute[s] evidence to be considered by the trier of fact." *Martinson Bros. v. Hjellum*, 359 N.W.2d 865, 875 (N.D. 1985). With respect to a claim for breach of fiduciary duty against an attorney, "representing both the buyer and a seller" in a transaction may constitute a conflict of interest and support a finding of liability. *Meyer*, 2001 ND 87, ¶ 15, 626 N.W.2d at 287. "While the existence and scope of a fiduciary duty depends on the parties' agreement, whether a person has breached a fiduciary duty presents a question of fact . . . ." *Border Res.*, 2015 ND 238, ¶ 18, 869 N.W.2d at 764. Similarly, the North Dakota Supreme Court has noted that "summary judgment is generally inappropriate in legal malpractice actions." *Moen*, 2001 ND 110, ¶ 10, 628 N.W.2d at 328; *see also Martinson Bros.*, 359 N.W.2d at 872 ("[I]n the context of a legal malpractice action, whether or not an attorney has breached his professional duty is ordinarily a question of fact.").

MSI's expert on ESOP transactions, Vogl, opines that "Defendants' simultaneous representation of Metro Sales and the ESOP trustees constituted an inherent and impermissible conflict of interest." (Vogl Rep. at 13-14.) As a general matter, Vogl explains that:

> Because an ESOP transaction involves both a seller and a buyer—the company's shareholders selling their securities and the trust established to purchase the securities for the company's employee's—each party must be represented by separate legal counsel due to the inherent conflicts of interest. Specifically, the company's existing shareholders have an interest

in receiving a higher per share price for the sale of their stock while the ESOP Trustee has an interest in obtaining the stock at the lowest price possible.

(*Id.* at 5.)

Vogl suggests that "performing valuation-support services on behalf of the ESOP trustees would have constituted an obvious conflict of interest given Defendants' representation of Metro Sales" because the ESOP trustees are responsible for selecting and working with an appraisal company to identify an appropriate share price. (*Id.* at 11.) Based on the information he considered in forming his opinion, Vogl concludes that "Defendants were representing not only Metro Sales, through its existing shareholders, but also the ESOP trustees." (*Id.* at 13.) Ultimately, Vogl provides the opinion that "Defendants improperly represented Metro Sales, Inc., its shareholders and the ESOP trustees, which presents an impermissible conflict of interest." (*Id.* at 17.)[11]

When asked whether he had "ever represented both the company and the ESOP trust at the same time in the same transaction," Defendants' ESOP expert, Steven Greenapple ("Greenapple"), stated that he had not because "[t]hat would be a conflict of interest." (*See* Second Vehrs Decl. ¶ 2, Ex. 40 ("Greenapple Dep.") at 31:10-15.) In his expert report, Greenapple outlines numerous services involved in establishing an ESOP. (Vehrs Decl. ¶ 2, Ex. 30 ("Greenapple Rep.") at 5-6.) His report states that "[a] business that considers whether to establish an ESOP and engage in an ESOP transaction, and

---

[11]    With regard to whether Mohagen breached any fiduciary duties, MSI's expert Cooperstein focuses his analysis on the reasonableness of Mohagen's fees and billing practices. (Cooperstein Rep. at 8-12.) MSI has not moved for summary judgment on this basis, so the Court does not consider Cooperstein's report at this stage on this issue.

decides to do so, requires a great deal of services." (*Id.* at 5.) Such services include, for

example, "analyzing the appropriateness of an ESOP for that business," "recommending

a structure for an ESOP transaction," "selecting an ESOP trustee," "assisting the ESOP

trustee in engaging legal and financial advisors," and "closing the ESOP transaction and

the related financing transaction." (*Id.* at 5-6.) Greenapple suggests that "[t]ypically

these services are performed by one or more individuals or organizations." (*Id.* at 6.)

Greenapple's report emphasizes the complexity of ESOP transactions and related

services. (*Id.*)

       In his deposition, Mohagen noted that it is "an extremely debatable thing" whether

an appraiser can work on behalf of the corporation and trustees in an ESOP transaction.

(Mohagen Dep. at 111:15-18.) After discussing a recent administrative development in

the ESOP field relating to potential conflicts of interest, Mohagen acknowledged that,

"obviously there's conflicts. ESOPs are loaded with conflicts. Always have been,

always will be." (*Id.* at 111:18-114:14.) Mohagen acknowledged that he did not copy

Mathwig on e-mails when "crossing over into transactional trustee territory" because

under recent administrative guidance, "it might appear that there's a conflict." (*Id.* at

115:9-24.) When asked whether he performed any work for the ESOP trustees, Mohagen

stated that "[w]e did work for the ESOP trustees on behalf of Metro Sales." (*Id.* at

11:9-13.) The proposed but unsigned consulting agreements related to "Director &

Transactional Trustee Appointments" and "ESOP Transactional Trustee Valuation

Assistance and Support" proposed consulting services that could be construed as work

done on behalf of the transactional trustees, such as "[d]esign[ing] and draft[ing]

Indemnification Agreements for the Transactional Trustees . . . effective January 1, 2014." (*See* Vehrs Decl. ¶ 2, Exs. 7, 11.)  The invoices Core sent to MSI also include references to services performed relating to the transactional trustees.  (*See* Vehrs Decl. ¶ 2, Ex. 21.)

Based on the evidence and construing the record in the light most favorable to Defendants, the Court concludes that there is a genuine issue of material fact regarding whether Core or Mohagen breached any fiduciary duties in its relationship with MSI.  In light of the complexity of establishing an ESOP and the number of interrelated services required to do so, a jury could reasonably infer that Core's services involving the transactional trustees were performed for MSI's benefit.  Expert testimony will be necessary to aid the trier of fact in evaluating a possible breach of fiduciary duty based on a purported conflict of interest, and the Court concludes that such facts are more properly resolved at trial.

Although the ESOP experts on both sides appear to agree that it would be a conflict of interest for an attorney to simultaneously represent both the company and the ESOP trustees in negotiations, the record does not conclusively establish that Mohagen in fact represented both parties in this manner.  Vogl's expert opinion that Defendants engaged in such conflicted representation can be weighed by a factfinder at trial.  Indeed, some evidence tends to suggest that Core provided services to the transactional trustees and even gave them advice or counsel on certain issues.  However, these services could reasonably be considered proper and within the scope of necessary services to MSI leading up to the ultimate stock sale.  Again, expert testimony will likely provide

significant assistance to the factfinder in evaluating Defendants' actions. Based on the complexity of the issues and construing the record in the light most favorable to Defendants, the Court declines to hold that Defendants breached a fiduciary duty on this record as a matter of law.

### 3. Damages

Third, even if MSI had established that Core and Mohagen owed MSI fiduciary duties and breached those duties by representing conflicting parties, the record does not conclusively establish that this purported conflict was causally related to the services for which MSI paid Core $60,000. As the North Dakota Supreme Court recently emphasized, "[d]amages are an essential element for a breach of fiduciary duties claim. Merely stating damages exist is not enough." *Vendsel*, 2017 ND 71, ¶ 18, 891 N.W.2d at 756 (citation omitted). Even where the facts support a finding that the defendant breached a fiduciary duty and held a conflict of interest, "there also must be evidence to raise a factual issue that the defendants' . . . breach of fiduciary duty proximately caused damage to the plaintiffs." *Meyer*, 2001 ND 87, ¶ 15, 626 N.W.2d at 287. With respect to an attorney-client relationship, the North Dakota Supreme Court has held that "[t]he lawyer who does not represent his client with undivided loyalty is not ordinarily entitled to compensation for his services." *Rolfstad, Winkjer, Suess, McKennett & Kaiser, P C. v. Hanson*, 221 N.W.2d 734, 737 (N.D. 1974). Given the disputed facts highlighted above, the Court finds that the issue of damages for any alleged breach of fiduciary duty is properly resolved at trial.

The Court will deny MSI's Motion for Summary Judgment on its breach-of-fiduciary-duty claim against Defendants. Because there is evidence in the record that tends to support liability on this basis, however, the Court also declines Defendants' invitation to grant summary judgment dismissal of this claim.

### E.    Unjust Enrichment

MSI argues that Defendants' unjust enrichment claim must be dismissed because the parties' claims are governed by express contracts, namely the First and Second Consulting Agreements. Notwithstanding the unsigned consulting agreements, MSI asserts that the terms of the executed agreements (including those requiring Core to notify MSI of additional services and fees it was incurring) control.

Defendants, on the other hand, argue that they have validly asserted their unjust enrichment counterclaim as an alternative claim to recover for services Core performed and for which MSI has refused to pay. Defendants argue that this claim is not barred because MSI did not execute the additional proposed consulting agreements.

Under North Dakota law, a claim of unjust enrichment requires proof of five elements:  "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) the absence of a justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *KLE Const., LLC v. Twalker Dev., LLC*, 2016 ND 229, ¶ 6, 887 N.W.2d 536, 538 (quoting *McColl Farms, LLC v. Pflaum*, 2013 ND 169, ¶ 18, 837 N.W.2d 359, 367). Unjust enrichment is an equitable theory applicable "in the absence of an express or implied contract."

*Northstar Founders, LLC v. Hayden Capital USA, LLC*, 2014 ND 200, ¶ 53, 855 N.W.2d 614, 633.

An existing contract between the parties forecloses a claim for unjust enrichment because any impoverishment flowing from a valid contract "is not contrary to equity." *Northstar Founders*, ¶ 57, 855 N.W.2d at 634 (quoting *BTA Oil Producers v. MDU Res. Grp., Inc.*, 2002 ND 55, ¶ 23, 642 N.W.2d 873, 882). In particular, a valid contract undermines the "essential element" underlying the theory of unjust enrichment—"the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value." *KLE Const.*, 2016 ND 229, ¶ 6, 887 N.W.2d at 538 (quoting *McColl Farms*, 2013 ND 169, ¶ 18, 837 N.W.2d at 367); *Apache Corp. v. MDU Res. Grp., Inc.*, 1999 ND 247, ¶ 15, 603 N.W.2d 891, 895; *see also Zuger v. N.D. Ins. Guar. Ass'n*, 494 N.W.2d 135, 138-39 (N.D. 1992). The presence of a contract between the parties also implies an adequate legal remedy by which the aggrieved party can seek recovery for any alleged impoverishment. *See KLE Const.*, 2016 ND 229, ¶¶ 14, 17, 887 N.W.2d at 540-41.

In short, "the jurisprudence of the Supreme Court of North Dakota clearly forecloses relief on claims for unjust enrichment in the face of an express contract." *JN Expl. & Prod. v. W. Gas Res., Inc.*, 153 F.3d 906, 913 (8th Cir. 1998). Indeed, "where . . . the parties have voluntarily entered into an *express written* contract which defines the rights of each, unjust enrichment is a *non sequitur*." *Id.* at 910; *see also Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 2004 ND 117, ¶ 28, 680 N.W.2d 634, 643 ("[I]t is well-settled that unjust enrichment applies only in the absence of a contract between the

parties, and there can be no implied-in-law contract when there is an express contract between the parties relative to the same subject matter.").

In light of these principles, the Court concludes that MSI is entitled to summary judgment on Defendants' unjust enrichment claim. By their terms, the First and Second Consulting Agreements plainly address MSI's payment obligations with respect to the services described in Exhibit 1 as well as "additional services" provided by Core.[12]  (1st CA ¶ 1; 2nd CA ¶ 1.)  If a factfinder ultimately concludes that Core is not entitled to additional fees because it failed to properly notify MSI that it was performing services outside the scope of the executed agreements, any impoverishment suffered by Core would be equitable under the written terms agreed upon by the parties.  The parties do not dispute the validity or enforceability of the First and Second Consulting Agreements. Indeed, these agreements are the basis for Defendants' breach-of-contract counterclaim, demonstrating that Core has an adequate remedy at law to pursue reimbursement for services rendered.  Thus, Defendants' unjust enrichment claim is properly dismissed.

### F.    Deceit

MSI argues that Defendants' deceit counterclaim is meritless because other than Mohagen's self-serving testimony Defendants failed to produce any evidence to support that MSI engaged in willful deception.  In particular, MSI argues that Defendants fall short of the clear and convincing evidence standard required to establish a deceit claim.

---

[12]      For this reason, the Court finds it immaterial that Mathwig failed to sign the remaining proposed consulting agreements.  The parties' relationship was governed by the signed Consulting Agreements until it was terminated, precluding the application of unjust enrichment.

Defendants argue that the evidence and inferences from the evidence support that Mathwig made a promise to sign the consulting agreements and pay the fees outlined in the Services Summary without intending to sign the agreements or pay the corresponding fees. Defendants point out that MSI has failed to present competent evidence to refute Mohagen's testimony about the April 7, 2015 telephone conversation and contend that Mathwig's deposition testimony and declaration conflict. In short, Defendants argue that genuine issues of material fact preclude summary judgment on this claim.

"One who willfully deceives another with intent to induce that person to alter that person's position to that person's injury or risk is liable for any damages which that person thereby suffers." N.D. Cent. Code § 9-10-03 (2017). For purposes of this provision, "[a] deceit" means, in relevant part, "[a] promise made without any intention of performing." N.D. Cent. Code § 9-10-02. Such a promise may establish deceit even if the promise "does not meet the requirements of a contract between the parties." *Erickson v. Brown*, 2008 ND 57, ¶ 25, 747 N.W.2d 34, 45 (N.D. 2008) (quoting *Delzer v. United Bank of Bismarck*, 527 N.W.2d 650, 653 (N.D. 1995)).

"Although deceit is ordinarily a question of fact, it must be established by clear and convincing evidence." *Id.* at ¶ 30, 747 N.W.2d at 47. At the summary judgment stage, a court evaluating a deceit claim may properly "consider the quantum of proof necessary to support liability." *Macquarie Bank Ltd. v. Knickel*, 723 F. Supp. 2d 1161, 1200 (D.N.D. 2010) (quoting *Erickson*, 2008 ND 57, ¶ 30, 747 N.W.2d at 47), *aff'd*, 793 F.3d 926 (8th Cir. 2015). "Deceit is ordinarily not susceptible of direct proof and may be inferred from the circumstances." *Delzer*, 527 N.W.2d at 656. However, where a claim

for deceit rests on an alleged promise made without any intention to perform, failure to provide clear and convincing evidence of that promise may render summary judgment dismissal appropriate. *See Macquarie Bank*, 723 F. Supp. 2d at 1198-1200.

The Court concludes that genuine issues of material fact exist, precluding summary judgment on Defendants' deceit claim. When viewed in the light most favorable to Defendants, the relevant evidence summarized above presents disputes of fact appropriate for resolution at trial. This is so even under the clear and convincing evidence standard. Specifically, if a jury finds Mohagen's testimony regarding the April 7, 2015 telephone conversation to be credible, it could reasonably conclude that Mathwig made the alleged promise to execute the remaining consulting agreements on behalf of MSI and pay related fees as outlined in the Services Summary. Notably, Mohagen's testimony is corroborated by subsequent e-mail correspondence referencing Mathwig's alleged agreement. Reasonable jurors could also infer from the circumstances that Mathwig made the alleged promise on behalf of MSI without intending to execute the consulting agreements and with the intent to induce Core to continuing providing services.

To be sure, the Court acknowledges that the evidence could also support that Mathwig engaged in no such willful deception. However, the Court's role at this stage is not to find facts, but to determine whether there are any genuine issues of fact appropriate for trial. Having concluded that there are, the Court denies MSI's motion for summary judgment on Defendants' deceit claim.

## II.    MSI's Motion to Exclude Expert Testimony

MSI has also moved to exclude Defendants' experts Leonard Sliwoski, Steven

Greenapple, and Duane Lillehaug from testifying at trial.  In short, MSI argues that all

three of these experts "would provide irrelevant and unreliable expert testimony and

should be excluded."  (Doc. No. 64 at 6.)  Defendants oppose MSI's motion.

### A.    *Daubert* Standard

Before accepting the testimony of an expert witness, the trial court is charged with

the "gatekeeper" function of determining whether an opinion is both relevant and

reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993); *Aviva*

*Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn. 2011).

Under Federal Rule of Evidence 702, which governs the admission of expert testimony, a

duly qualified expert may testify if:  (1) "the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to

determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the

testimony is the product of reliable principles and methods"; and (4) "the expert has

reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702;

*see also Lauzon v. Senco Prods., Inc*., 270 F.3d 681, 686 (8th Cir. 2001).

Rule 702 recognizes five bases for expert qualification:  "knowledge, skill,

experience, training, or education."  Fed. R. Evid. 702.  While an expert witness must be

qualified to testify in a given subject area, the requirement is not rigorous, and "[g]aps in

an expert witness's qualifications or knowledge generally go to the weight of the

witness's testimony, not its admissibility."  *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783

F.3d 720, 726 (8th Cir. 2015) (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006)).

The Court also notes that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and it favors admissibility over exclusion. *Lauzon*, 270 F.3d at 686 (quoting *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999), *aff'd*, 528 U.S. 440 (2000)). When examining an expert opinion, a court applies a general rule that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). "[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," then it must be excluded. *Id.* at 929-30. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." The proponent of the evidence has the burden of establishing by a preponderance of the evidence that testimony is admissible. *Lauzon*, 270 F.3d at 686.

An expert's testimony should not be excluded based on "mere disagreement with the assumptions and methodology used." *See S.E.C. v. Das*, 723 F.3d 943, 951 (8th Cir. 2013) (quoting *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007)). As the Supreme Court has emphasized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at

596. Notwithstanding "some flaws in the expert['s] methods, if the testimony is within

the range where experts might reasonably differ, the jury, not the trial court, should be the

one to decide among the conflicting views of different experts." *Hill v. Sw. Energy Co.*,

858 F.3d 481, 486 (8th Cir. 2017) (quotation marks and citation omitted); *see also*

*Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) ("[D]istrict courts are

admonished not to weigh or assess the correctness of competing expert opinions.").

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor

of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

### B.    Defendants' Expert Leonard Sliwoski

MSI moves to exclude testimony by Defendants' expert Leonard Sliwoski

("Sliwoski"). Sliwoski has more than three decades of experience as an accounting

professor and litigation and business consultant. (Vehrs Decl. ¶ 2, Ex. 32 ("Sliwoski

Rep.") at 4 & Ex. B at 1-2.) He is experienced in assessing commercial damages and

valuing closely-held businesses, and he has provided litigation support or expert

testimony in numerous cases. (*Id.* at 4.) In this case, Sliwoski offers an opinion on

Core's damages. (*Id.* at 1.) Specifically, Sliwoski's report states that "[o]ur opinion of

economic damages relates only to future lost profit after ESOP formation, and the

opinion is based on information that is referenced in this report." (*Id.*) Such information

includes the signed and unsigned Consulting Agreements as well as interviews with

Mohagen and Bart McIlonie. (*Id.* at 3-4.) Importantly, Sliwoski notes the following

regarding the basis for his opinion in this matter: "It is management's assertion, and we

have relied on this assertion, that approximately $150,000 of annual revenue would occur for a seven-year time period if ESOP formation would have occurred, and that Core Consulting would have provided ESOP services to earn the $150,000 of annual revenue." (*Id.* at 2.) Taking into account Core's operating expenses, Sliwoski opines that Core's lost profit damages amount to "approximately $517,000." (*Id.*) MSI asserts two primary bases for excluding Sliwoski's testimony: (1) that his opinions relating to future lost profit damages are unreliable; and (2) that these opinions are irrelevant.

MSI argues that Sliwoski's opinion is unreliable "because it is based on speculation rather than on any substantive facts." (Doc. No. 64 at 10.) Specifically, MSI contends that there is no support for Sliwoski's assumption that MSI would have engaged Core to provide future services following the ESOP formation. MSI also argues that a purported agreement to provide services into the future for seven years would need to be in writing to be enforced and notes that there is no such written contract. MSI also suggests that Defendants' argument that they were entitled to seven years of services into the future is contrary to the freedom of parties to terminate a professional services relationship at any time. Finally, MSI argues that there is no support for Defendants' estimate that future services would have resulted in $150,000 in revenue each year or that those services would last for seven years. Along with challenging the reliability of Sliwoski's opinions, MSI argues that they are irrelevant in light of the fact that no agreement for post-ESOP formation services existed between the parties. Even if Defendants' breach-of-contract counterclaim succeeds, MSI argues, "it is not entitled to damages for hypothetical post-ESOP formation services." (Doc. No. 77 at 3.)

50

Defendants contend that Sliwoski's opinions are both reliable and relevant. Defendants challenge MSI's suggestion that Sliwoski's opinions are based on unsupported facts. Rather, Defendants argue that his opinions are "premised on the need for post-ESOP administration services to be provided by Core, and of which MSI was informed of [sic] prior to MSI terminating the relationship." (Doc. No. 72 at 12-13.) Defendants argue that future lost profits damages are relevant in light of Core's counterclaims against MSI for deceit and breach of contract. According to Defendants, deceit claims permit broad damages, even those not anticipated. Similarly, Defendants argue that lost profit damages are permissible in a breach-of-contract action if they are reasonable, even if they are not certain.

The Court concludes that Sliwoski's testimony is neither reliable nor relevant and should therefore be excluded. Sliwoski's opinion regarding Core's lost profit damages relies on unfounded assumptions that Core would provide post-ESOP formation services to MSI and that those services would result in $150,000 of revenue on an annual basis for seven years. There was no agreement between the parties regarding post-ESOP-formation services, and Defendants have pointed only to cursory and preliminary references to the need for such services being provided. Notably, the executed Consulting Agreements state that "[a]t [MSI's] sole discretion [Core] or other service providers may be engaged separately and specifically to address the issues raised by the Consultant." (1st CA ¶ 1; 2nd CA ¶ 1.) Because Sliwoski's opinion regarding future lost profits is founded on unwarranted assumptions, his opinion is not sufficiently reliable to provide assistance to the factfinder. *See Meterlogic, Inc. v. KLT, Inc.*, 368

F.3d 1017, 1019 (8th Cir. 2004) (affirming the district court's conclusion that an expert's testimony regarding damages was unreliable; noting that the expert "predicted financial results ten years into the future even though the parties' contract extended only two years and allowed for termination at any time" and "assumed that Meterlogic would be the sole representative of the appellees, even though the contract was a non-exclusive agreement").

Defendants argue that Sliwoski's opinion should not be excluded because it is relevant for assessing damages with respect to Core's deceit and breach-of-contract counterclaims. However, neither the record nor the law support Core's claimed entitlement to future lost profit damages under these claims. The North Dakota Supreme Court has explained that in a breach-of-contract action, "the injured party may not recover conjectural profits." *Bergquist-Walker Real Estate, Inc. v. William Clairmont, Inc.*, 333 N.W.2d 414, 420 (N.D. 1983). Specifically, "[i]n connection with the loss of prospective profits, the injured party can recover only to the extent that the evidence he produces affords a sufficient basis for estimating with reasonable certainty the amount of profits prevented by the wrongful breach of the contract." *Id.*; *see also Leingang v. City of Mandan Weed Bd.*, 468 N.W.2d 397, 398 (N.D. 1991) ("[A] party is entitled to recover for the detriment caused by the defendant's breach, including lost profits if they are reasonable and not speculative."). As noted above, the executed Consulting Agreements do not provide a reasonable basis to support Core's entitlement to post-ESOP formation services.

With respect to deceit, North Dakota law provides that "[o]ne who willfully deceives another with intent to induce that person to alter that person's position to that person's injury or risk is liable for any damage which that person thereby suffers." N.D. Cent. Code § 9-10-03 (2017). Damages for such a claim are measured according to "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." N.D. Cent Code § 32-03-20 (2017). Although "[t]he measure of damages in tort is broader than in contract," *Delzer v. United Bank*, 1997 ND 3, ¶ 17, 559 N.W.2d 531, 536 (citation omitted), the claimed damages must still bear a proximate relationship to the alleged deceit, *see Schneider v. Schaaf*, 1999 ND 235, ¶ 18, 603 N.W.2d 869, 875 (noting that the North Dakota Supreme Court has "rejected an all-encompassing concept of damages in fraud and deceit cases"). As in a breach-of-contract action, in a tort claim, "[d]amages for lost profits are recoverable when they are reasonable and not speculative." *See Red River Wings, Inc. v. Hoot, Inc.*, 2008 ND 117, ¶ 42, 751 N.W.2d 206, 223. Even if Defendants prevail on their deceit claim based on Mathwig's alleged promise to execute the unsigned consulting agreements, Core's claimed entitlement to lost profits for post-ESOP formation services is simply too speculative to justify an award of damages.

Because Sliwoski's opinion is based on unreliable assumptions and is irrelevant to any damages to which Defendants are lawfully entitled, the Court will grant MSI's motion to exclude his testimony.

### C.    Defendants' Expert Steven Greenapple

MSI also challenges the admissibility of the testimony of Defendants' expert Steven Greenapple.  Greenapple has a J.D. from Cornell Law School and has been practicing law since 1984.  (Greenapple Rep. at 1.)  Since 1990, he has been involved in transactions involving ESOPs, and his current practice includes "well over 90% ESOP related work."  (*Id.* at 1-2.)  Greenapple is also a shareholder of a "financial advisory firm," SES Advisors, Inc. ("SES"), that provides ESOP-related services.  (*Id.*)  His work with SES involves "ESOP feasibility studies," financing, record-keeping, and other consulting services.  (*Id.* at 2.)  Greenapple explains that "[a]lthough I do not personally perform the analysis required for these services, I am very involved in the process of identifying and explaining the need for such services, negotiating the terms upon which such services will be provided, and presenting the results of such services."  (*Id.*)  Greenapple is also "a member of, and a frequent speaker for, The ESOP Association and of the National Center for Employee Ownership, and is the Immediate Past Chair of The ESOP Association's Legislative and Regulatory Committee."  (*Id.*, Attachment at 1.)  Greenapple intends to testify about whether MSI was an appropriate candidate for an ESOP, the appropriateness of Core's consulting agreements and fees, and whether MSI demonstrated an intention to proceed with the ESOP transaction in the spring of 2015.  (*See generally* Greenapple Rep.)

MSI seeks to exclude Greenapple's opinions because they are both (1) unreliable and (2) irrelevant.  Regarding reliability, MSI asserts that Greenapple used an unreliable methodology for evaluating the reasonableness of Defendants' fees.  Specifically, MSI

questions the applicability of a fair market value standard for assessing the appropriateness of Defendants' fees.  This standard, MSI suggests, arises from the Employee Retirement Income Security Act ("ERISA") definition of fair market value and applies to arms-length transactions rather than fees for professional services.  MSI argues that "Greenapple's novel application of the ERISA standard to professional services has not been tested, subject to peer review, and is not generally accepted."  (Doc. No. 64 at 14.)  According to MSI, Defendants have not met their burden to establish the reliability of this method.  MSI also notes that Greenapple relied on propositions that conflict with the evidence in the record such as a purported agreement between the parties to the fixed fees proposed by Core.  In short, MSI argues, "Greenapple's opinion regarding the appropriateness of Core and Mohagen's fees is unreliable, irrelevant, and provides no assistance to the jury."  (*Id.* at 16.)  MSI also argues that Greenapple's other proffered opinions are improper expert testimony and are irrelevant to MSI's fiduciary duty claim or Defendants' counterclaims.  In particular, these opinions include (1) that MSI was an excellent candidate for ESOP formation, (2) that MSI intended to follow through with the ESOP transaction as of April 2015, and (3) that Defendants appropriately presented their services to MSI through multiple agreements.  In particular, MSI suggests that these opinions are not relevant for evaluating the existence of an attorney-client relationship or whether Mohagen engaged in conflicted representation in the ESOP transaction.

Defendants argue that Greenapple is qualified to provide an opinion on the appropriateness of Core's fees and suggest that Greenapple's methodology for reaching this conclusion can be evaluated at trial.  According to Defendants, "[s]imply because

MSI does not agree with the 'fairness' methodology used to determine whether the fees

charged by Core were reasonable does not require exclusion of Greenapple's opinions."

(Doc. No. 72 at 4.)  Defendants suggest that MSI put this issue into question by alleging

that Core's fees were not reasonable.  Regarding the three other opinions offered by

Greenapple, Defendants suggest that those opinions "are all relevant to rebutting MSI's

allegations."  (*Id.* at 5.)  In particular, Defendants argue that Greenapple's opinions are

relevant for evaluating MSI's breach-of-fiduciary-duty claim, tied to the allegations in the

Complaint, and responsive to the opinions of MSI's experts.

The Court concludes that Defendants' expert, Greenapple, should be permitted to

testify at trial.  Greenapple's opinions are sufficiently reliable and relevant and would

provide assistance to the jury in resolving the claims at issue.

First, Greenapple's opinion regarding Core's fees should not be excluded based on

an arguably unreliable methodology.  Greenapple explains the standard by which he

evaluated Core's fees as follows:

> The appropriateness of fees is largely a question of fairness.  Fairness is a
> fundamental issue in the ESOP world.  ERISA defines "fair market value"
> as "the price at which an asset would change hands between a willing buyer
> and a willing seller when the former is not under any compulsion to buy
> and the latter is not under any compulsion to sell, and both parties are able,
> as well as willing, to trade and are well-informed about the asset and the
> market for that asset."
>
> Stated a little more simply, if both parties are willing, neither is under any
> compulsion, and both are well informed, the price they agree on is, by definition,
> fair.  The same concepts are applicable in determining the fairness of a fee for
> services . . . .

(Greenapple Rep. at 6-7.)  Greenapple thereafter applies this standard to the parties'
transaction based on a review of numerous e-mails between the parties illustrating that
"[t]he fees were discussed and negotiated extensively."  (*Id.* at 7-8.)  When asked in his
deposition whether "ERISA govern[s] what fees can be charged by professional service
providers in ESOP transactions," Greenapple responded, "Not that I know of."
(Greenapple Dep. at 133:12-15.)

The Court is not persuaded that Greenapple's methodology is so unreliable to
warrant exclusion.  In particular, a lack of peer review, testing, or general acceptance is
not dispositive in evaluating an expert's methodology, and a court need not apply these
factors in all cases.  *See Kumho*, 526 U.S. at 152 ("[A] trial court should consider the
specific factors identified in *Daubert* where they are reasonable measures of the
reliability of expert testimony.").  Here, Greenapple's opinion is not based on the type of
expertise where such factors should carry significant weight.  MSI may raise its criticisms
of Greenapple's application of a fair market value standard in opining on the
reasonableness of Core's fees at trial.

The Court also finds Greenapple's opinion to be sufficiently reliable even though
it relies on disputed facts.  Specifically, Greenapple based his opinion in part on the
proposition that "Mr. Jerry Mathwig and MSI agreed to the fees proposed by [Core]."
(Greenapple Rep. at 8.)  In his deposition, Greenapple acknowledged that the parties
dispute whether MSI agreed to the proposed consulting agreements and fees.
(Greenapple Dep. at 140:23-142:3.)  However, after reviewing documents in the case,
Greenapple made the conclusion that the parties reached such an agreement.  (*See id.*)  As

the Court previously concluded in evaluating Defendants' deceit counterclaim, a jury could reasonably conclude Mathwig promised to pay the proposed fees in light of the evidence in the record. To the extent MSI wishes to challenge the factual basis for Greenapple's opinion, it may do so at trial.

Second, the Court finds Greenapple's opinions to be relevant in light of MSI's allegations against Defendants. Specifically, in its breach-of-fiduciary claim, MSI alleges that "Mohagen and Core Consulting breached their fiduciary duties to MSI by, among other things, recommending services and courses of action that were not in the best interests of MSI, [and] attempting to charge MSI amounts vastly in excess of the flat fees that MSI agreed to pay." (Compl. ¶ 32.) MSI also alleges that "[u]pon information and belief, Core Consulting and Mohagen's recommendation of an ESOP to MSI was motivated by a desire to earn fees for professional services, rather than by a proper and informed assessment of MSI's best interests." (*Id.* ¶ 17.) In addition, MSI alleges that "[u]pon information and belief, Core Consulting divides the agreements for the services it proposes into numerous different contracts in an effort to obscure the exorbitant amount of fees that it tries to collect . . . and to make ESOP-related work appear vastly more complex than it is in reality." (*Id.* ¶ 14.) MSI also alleges that Defendants' billings violate the North Dakota Rule of Professional Conduct that prohibits unreasonable fees. (*Id.* ¶ 28.) Consistent with these allegations, MSI's expert, Vogl, opines on the reasonableness of Core's fees and consulting agreements in his expert report. (*See generally* Vogl Rep.) Although MSI has limited its breach-of-fiduciary claim at summary judgment to the issue of whether Defendants improperly represented both sides

in the anticipated ESOP transaction, MSI has not claimed to have waived alternative

theories on which it may pursue its breach-of-fiduciary duty claim at trial.  In light of the

allegations in the Complaint, the Court concludes that Greenapple's opinions are

relevant.[13]  Depending on the breach-of-fiduciary-duty theory MSI ultimately pursues at

trial, the Court will entertain objections to limit Greenapple's testimony as appropriate at

a later time.[14]

---

[13]    Greenapple's report provides an opinion that certain actions by MSI and the transactional trustees in April and May 2015 "indicate an intention on the part of MSI and Mr. Mathwig to proceed with the ESOP transaction."  (Vehrs Decl. ¶ 2, Ex. 30 ("Greenapple Rep.") at 9.)  To the extent this opinion can be construed as seeking an opinion on "the state of mind, intent, or motives of" MSI or particular individuals, the Court agrees with MSI that such expert testimony would be improper.  *See Kruszka v. Novartis Pharms. Corp.*, 19 F. Supp. 3d 875, 888 (D. Minn. 2014).  However, to the extent it becomes relevant to the claims and theories advanced at trial, Greenapple may appropriately testify on this issue to assist the factfinder in evaluating MSI's actions.  The Court reserves the right to address this issue further at trial.

[14]    The Court also notes that Greenapple's testimony will be useful for assisting the jury in developing a "global understanding" of ESOPs and the services required to establish an ESOP.  *See Clark ex rel. Clark v. Heidrick*, 150 F.3d 912, 914-915 (8th Cir. 1998) (affirming the admission of expert testimony that "gave the jury a global understanding of possible causes of" brachial plexus injuries").  The Court concludes that ESOP transactions are "a subject matter on which the factfinder can be assisted by an expert," and that general background testimony on this topic will be useful at trial.  *See United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011) (quoting Advisory Committee's Note on Fed. R. Evid. 702); *see also id.* ("In some cases, it might be important 'for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case' such as 'instruct[ing] the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports.'" (quoting Advisory Committee's Note on Fed. R. Evid. 702)).
    The Court will not, however, permit Greenapple to testify to any opinions not disclosed in his expert report.  Specifically, Greenapple did not render an opinion on whether Defendants' services on behalf of MSI and the transactional trustees were affected by a conflict of interest.  To the extent Greenapple's report contains background

(Footnote Continued on Next Page)

In short, the Court concludes that Greenapple's testimony is both sufficiently reliable to be admitted at trial and relevant to the claims and allegations asserted in this case. MSI's challenges largely go to the weight of Greenapple's testimony rather than its admissibility and should therefore be addressed at trial.

### D.     Defendants' Expert Duane Lillehaug

Finally, MSI moves to exclude testimony by Defendants' expert Duane Lillehaug, an expert disclosed to rebut the testimony of MSI's expert, Eric Cooperstein. Lillehaug is an attorney who received his J.D. from the University of North Dakota in 1975. (Lillehaug Rep., Ex. A at 1.) He has been admitted to practice law in North Dakota and Minnesota for more than four decades. (*Id.* at 2-3.) Lillehaug practices in "personal injury, wrongful death, insurance coverage, commercial and business disputes and employment law in both Minnesota and North Dakota." (Second Vehrs Decl. ¶ 2, Ex. 41 ("Lillehaug Dep.") at 10:9-18.) He has held numerous professional memberships and leadership positions in the legal community, including serving as President of the Minnesota Association for Justice from 2002 through 2003. (Lillehaug Rep., Ex. A at 3-4.) Lillehaug intends to provide an opinion on the applicability of the North Dakota Rules of Professional Conduct to Core's relationship with MSI. (*Id.* at 1.)

MSI argues that Lillehaug's testimony should not be admitted for two reasons: (1) he lacks the requisite qualifications, and (2) his opinions are unreliable. Essentially,

_____

(Footnote Continued From Previous Page)

information that could assist the jury in evaluating this issue, the Court will permit such testimony. Greenapple, however, will not be permitted to offer an undisclosed opinion.

MSI contends that "Lillehaug's testimony should be excluded because professional ethics is not within his area of expertise and he has not shown the application of any valid reasoning or methodology with respect to his conclusions."  (Doc. No. 77 at 7.)

First, MSI argues that "Lillehaug has no specialized knowledge, skill, experience, training or education in attorney ethics or professional responsibility."  (Doc. No. 64 at 19.)  In particular, MSI points out that Lillehaug has no particular training in ethics beyond the minimum required of all licensed North Dakota attorneys and that necessary to obtain malpractice insurance.  MSI also notes that Lillehaug has no relevant expertise regarding ESOPs.  MSI suggests that "Lillehaug's proposed testimony regarding the application of the Rules of Professional Conduct to the facts of this case are well beyond the scope of his expertise."  (*Id.* at 21.)

Second, MSI contends that Lillehaug's testimony should be excluded because his opinions are not reliable and would be of no assistance to a jury.  In particular, MSI asserts that Lillehaug's opinion regarding whether Defendants provided legal services to MSI is based on certain flawed or incorrect assumptions and an unreliable methodology. MSI emphasizes Lillehaug's reliance on the disclaimer language in the First and Second Consulting agreements and suggests that Lillehaug failed to properly evaluate the nature of the services provided.  MSI also notes that Lillehaug failed to clearly identify the definition of "legal services" he applied in reaching his opinion.  According to MSI, Lillehaug failed to apply reliable principles in evaluating the disclaimers, and he failed to consider a relevant North Dakota ethics opinion which states that disclaimers are ineffective if legal services are provided.  MSI further notes that Lillehaug's analysis of

this issue is based on facts provided by Mohagen regarding ESOP transactions.  For this reason, MSI suggests, "Lillehaug's opinion on whether Core and Mohagen provided legal services amounts to an improper attempts [sic] to cloak Core and Mohagen's own self-serving arguments in the authority of expert testimony."  (*Id.* at 24.)  Similarly, MSI notes that Lillehaug's reference to the dismissal of the ethics complaint against Mohagen is merely "restating the conclusions of others."  (Doc. No. 77 at 10.)

MSI also challenges the reliability of Lillehaug's opinion regarding whether Defendants engaged in law-related services subject to Rule 5.7 of the North Dakota Rules of Professional Conduct.  According to MSI, Lillehaug failed to reliably analyze whether Core provided services that would fall under the provision of law-related services in this rule.  MSI challenges Lillehaug's conclusion that Rule 5.7(a) does not apply because Lillehaug does not specify a rationale for the weight he gives to certain facts supporting his opinion.  In short, MSI argues that "even if Lillehaug were qualified to provide expert testimony on legal ethics, his methodology is so woefully unreliable and inadequate that it would provide no assistance to the jury and should be excluded."  (Doc. No. 64 at 28.)

Defendants argue that "Lillehaug is well qualified, based upon his knowledge, skill, and experience, to offer opinions about whether Mohagen breached any obligations under the applicable rules of professional conduct."  (Doc. No. 72 at 7.)  Defendants point to Lillehaug's forty-one years of experience practicing law and note that Lillehaug has specifically handled legal malpractice cases in the past five years.  Defendants further argue that Lillehaug does not need any specialized knowledge of ESOPs to give an opinion on legal ethics in this matter.  Defendants emphasize that MSI may rebut

Lillehaug's opinions or challenge them through cross-examination at trial and argue that his opinion should not be excluded.

Regarding reliability, Defendants argue that MSI's challenges address weight and credibility rather than admissibility. Defendants point out that Lillehaug is licensed to practice law in North Dakota whereas MSI's legal ethics expert is not, rendering Lillehaug's opinion helpful to a jury and reliable. In response to MSI's challenges to Lillehaug's methodology, Defendants argue that "Lillehaug properly analyzed the language of Rule 5.7 and the corresponding commentary in determining that Mohagen/Core took proper steps to ensure that no attorney-client relationship was formed with MSI." (*Id.* at 10.) Defendants also note that Lillehaug did cite the North Dakota ethics opinion that MSI asserts he failed to consider. In addition, Defendants point out that Lillehaug gave proper consideration to the dismissal of the ethics complaint filed against Mohagen related to the facts underlying this matter. Because MSI's expert failed to give this disposition weight, Defendants argue that Lillehaug provides a more reliable and relevant opinion.

The Court concludes that Lillehaug should be permitted to testify at trial. First, the Court concludes that Lillehaug is qualified to testify on the matters outlined in his report. Lillehaug has previously offered deposition testimony in a legal malpractice case in North Dakota state court. (Lillehaug Rep., Ex. B; Lillehaug Dep. at 6:4-7:21.) Although Lillehaug does not consider himself to be an expert in ESOPs, he does consider himself "an expert in lawyer ethics and professional responsibility." (Lillehaug Dep. at 12:5-18.) In his deposition, Lillehaug explained that he obtains a minimum of three

hours of ethics training each year along with additional seminars on occasion. (*Id.* at 13:1-7.) Lillehaug has represented one or two clients in legal malpractice cases in the past five years. (*Id.* at 14:5-14.) Lillehaug's four decades of experience as an attorney as well as his specific experience representing clients and testifying in a legal malpractice matter demonstrate that he is qualified to assist the jury in understanding the applicability of the ethics rules in this case. Any gaps in Lillehaug's qualifications go to the credibility of his testimony, not its admissibility.

Second, the Court determines that Lillehaug's methodology is sufficiently reliable to permit his testimony on the matters outlined in his expert report. Lillehaug's ultimate opinion is that the North Dakota Rules of Professional Conduct did not apply to Core's provision of services to MSI. (Lillehaug Rep. at 1.) This opinion is supported by two separate conclusions. First, "any 'law-related services,' as defined in Rule 5.7(b), N.D.R.Prof.Cond., were provided in circumstances that were distinct from the lawyers provision of legal services to clients." (*Id.*) Second, "the lawyer took reasonable measures to assure that the person obtaining the legal [sic][15] services knew that the services provided were not legal services and that the protections of the client/lawyer relationship did not exist." (*Id.*) In reaching his opinion, Lillehaug reviewed the North Dakota Rules of Professional Conduct and related commentary, ethics opinions, caselaw, and documentary materials related to this lawsuit. (*Id.*; Lillehaug Dep. at 15:12-17:3, 45:21-46:25.) Lillehaug also relied upon two conversations with Mohagen

---

[15]    *See supra* note 10.

regarding the matter. (Lillehaug Dep. at 18:22-22:14.) To the extent any particular

methodology is necessary in order for an expert to render an opinion in this context, the

Court is persuaded that Lillehaug reliably applied a valid methodology in forming his

opinion. MSI may certainly cross-examine Lillehaug on any particular shortcomings in

his methodology at trial. Likewise, any challenges to the factual basis for Lillehaug's

opinion may be raised on cross-examination. Ultimately, a factfinder can evaluate the

weight to afford his testimony based on the competing opinion of MSI's own expert. The

Court's role at this stage, however, is not to weigh competing expert opinions. Because

Lillehaug reliably applied a valid methodology in rendering an opinion, the Court

declines to exclude his testimony on this basis.

Specifically, MSI criticizes Lillehaug's failure to adequately analyze whether the

ESOP services being rendered by Core and Mohagen were legal services or law-related

services under Rule 5.7 of the North Dakota Rules of Professional Conduct. In

evaluating the circumstances and rendering an opinion, Lillehaug did so "[e]ven

assuming that some of the services Core Consulting provided to Metro Sales were

'law-related services.'" (Lillehaug Rep. at 3.) His opinion also appears to rest on the

premise that the services provided were not "legal services" under the rule. (*See id.*)

MSI clearly disputes these underlying premises, but that dispute does not render

Lillehaug's entire opinion unreliable or unhelpful to the jury.

Lillehaug agreed in his deposition that the rule relating to disclaimers "only comes

into play if the services are solely law-related services." (Lillehaug Dep. at 51:8-12.) He

also agreed that a lawyer is subject to the rules of professional conduct if he in fact

provides legal services.  (*Id.* at 34:14-35:1.)  Finally, he agreed that the rules apply where a lawyer is providing legal and law-related services in the same representation.  (*Id.* at 40:19-24.)  Lillehaug stated that he would defer to the expertise of Defendants' ESOP expert, Greenapple, regarding which services are commonly performed by lawyers in an ESOP transaction.  (*Id.* at 60:19-61:1.)  The Court agrees that Lillehaug's analysis could be clearer regarding whether legal services were provided.  However, to the extent the factfinder concludes Core provided only law-related services and not legal services, Lillehaug's opinion will aid the jury in evaluating the nature of the parties' relationship and the scope of Core's obligations to MSI.  Although MSI disputes the assumptions or premises upon which Lillehaug based his opinion, the Court concludes that his testimony is sufficiently reliable and will be useful in helping the jury to evaluate the issues.

Rule 702 is a rule "of admissibility rather than exclusion."  *Lauzon*, 270 F.3d at 686 (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir.1991)).  Notwithstanding any doubts about Lillehaug's methodology or the bases for his ultimate opinion in this matter, the Court concludes that he may properly testify at trial.[16]

---

[16]    The Court notes that Lillehaug's testimony shall be admitted only to the extent it does not wade into offering legal conclusions properly reserved for the factfinder.  While Lillehaug may assist the factfinder in evaluating the standard of care applicable to the relationship between the parties, Lillehaug will not be permitted to instruct the jury on the law.  *See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible.  Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." (citation omitted)).

In addition, as the Court noted with respect to Greenapple's anticipated testimony, Lillehaug may not offer any undisclosed opinions.  The Court will entertain objections at

(Footnote Continued on Next Page)

## CONCLUSION

In light of genuine fact disputes in the record, the Court concludes that MSI is not entitled to summary judgment on its declaratory judgment or breach-of-fiduciary-duty claims.  In addition, the Court concludes that the record precludes dismissal of Core's breach-of-contract and deceit counterclaims at this stage.  However, Core's counterclaims for promissory estoppel and unjust enrichment are dismissed.  The record fails to support that Mathwig made a sufficiently clear and definite promise to support a promissory estoppel claim, and Core's unjust enrichment claim is foreclosed by the First and Second Consulting Agreements which governed the parties' obligations.  At trial on the remaining claims, the Court will permit the testimony of Steven Greenapple and Duane Lillehaug, but Leonard Sliwoski may not testify regarding future lost profits.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. [59]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

       a.    The motion is **GRANTED** with respect to Defendant Core Consulting Group, LLC's ("Core") counterclaim Count II – Unjust Enrichment, and this claim is **DISMISSED WITH PREJUDICE**.

---

(Footnote Continued From Previous Page)

trial as appropriate to properly limit Lillehaug's opinions to those contained in his expert report.

b.      The motion is **GRANTED** with respect to Core's

counterclaim Count III – Promissory Estoppel, and this claim is

**DISMISSED WITH PREJUDICE**.

c.      The motion is denied in all other respects, and the following

claims will proceed to trial:  (1) Plaintiff's Count I – Breach of Fiduciary

Duty; (2) Plaintiff's Count II – Declaratory Judgment; (3) Core's

counterclaim Count I – Breach of Contract; and (4) Core's counterclaim

Count IV – Deceit/Misrepresentation.

2.      Plaintiff's Motion to Exclude Expert Testimony (Doc. No. [62]) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The motion is **GRANTED** with respect to Leonard Sliwoski,

and his opinion shall be presumptively inadmissible.

b.      The motion is **DENIED** with respect to Steven Greenapple

and Duane Lillehaug, and their expert opinions shall be presumptively

admissible, subject to proper foundation being established.


Dated:  July 26, 2017                          s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               United States District Judge